Charles SCHANOU, Plaintiff,

v.

LANCASTER COUNTY SCHOOL DISTRICT NO. 160, a/k/a Norris School District No. 160, et al., Defendants.

No. 4:CV93–3394.

United States District Court,
D. Nebraska.

Aug. 31, 1994.

9. This provision is designed to maintain the status quo during the pendency of any appeal.

Thom K. Cope, Lincoln, NE, for plaintiff.

Gregory H. Perry, Lincoln, NE, for defendants.

### MEMORANDUM AND ORDER

KOPF, District Judge.

Pending before the court are motions for summary judgment filed by the plaintiff and the defendants.

This is a civil rights case, brought pursuant to 42 U.S.C. §§ 1983 and 1988, in which the plaintiff, a parent and member of the school board, claims the public school violated his First Amendment rights by allowing a religious group known as the Gideons to distribute a Bible to his child after school, and, when the plaintiff brought the practice to the attention of the school board and the superintendent, by failing to act to prohibit such activity. After these events took place, the plaintiff resigned from the school board, removed his child from the school system, and placed the child in another school system where he was employed as a teacher. The plaintiff now seeks damages, and, because

the Bible-distribution policy still prevails at the school, injunctive relief as well.

The plaintiff seeks summary judgment because he believes the undisputed facts compel the conclusion that the policy and conduct of the defendants clearly violated the Establishment Clause of the First Amendment.[1] The defendants, on the other hand, seek summary judgment because: (a) they believe their policies and conduct did not violate the Establishment Clause of the First Amendment; (b) they believe the plaintiff's claims are barred by the statute of limitations; (c) they believe the plaintiff has no standing to prosecute a suit for injunctive relief (although they concede he has standing to assert his damage claim); and (d) they believe they are entitled to qualified immunity from a suit for damages.

I heard oral argument on these motions. Both counsel agree that for purposes of the motions for summary judgment regarding the merits, no material facts are in dispute. (Filing 60, Tr. 2:1–21; 27:23–29:5.)

I shall deny the plaintiff's motion. I shall grant the defendants' motion on the merits and enter judgment for the defendants. With regard to the merits, my decision is in two parts.

First, I find that the one distribution of Bibles involving the plaintiff's son, who was then a sixth grader, occurred in a hallway after school hours; however, the hallway distribution was not done or authorized by any of the defendants. Assuming such a distribution was potentially unconstitutional if authorized, the defendants have no liability since they did not authorize the distribution.

Second, I also find that the distribution of Bibles to fifth grade students pursuant to the declared policy of the school board is not unconstitutional under the following circumstances:

1. The First Amendment to the Constitution has been understood as having clauses, such as the Free Speech Clause, the Establishment Clause and the Free Exercise Clause. *See Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* —— U.S. ——, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (holding that school district violated Free Speech Clause in denying church access to school solely because the film the church wished to show dealt with religion, and further holding

that allowing the church access to the school did not violate the Establishment Clause). The text of the First Amendment states:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

(1) Largely because of the rural nature of the communities served by the school district, the entire school and all its facilities are, by tradition and policy of the school board, open for a wide variety of uses by school district patrons after school hours;

(2) Distribution of the Bibles takes place once a year, only after school hours;

(3) Distribution occurs on one of two sidewalks outside the school building;

(4) The children are always told by their teachers that they have no obligation to take a Bible, and the teachers walk with the children as they exit the school building;

(5) Only private individuals distribute the Bibles, and no public funds are expended as part of the distribution;

(6) Bibles are not thrust into the hands of the children but placed on a table from which the children may take a Bible if they wish;

(7) Those distributing the Bibles do not normally engage the children in conversation, or otherwise "proselytize," except to state that the Bibles are free.

In reaching my decision regarding the declared policy of the school board, I have applied the much maligned but still viable *Lemon* test. *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). *See e.g., The Good News/Good Sports Club v. School Dist. of the City of Ladue,* 28 F.3d 1501 (8th Cir.1994) (applying *Lemon* in context of suit by religious group challenging school policy that closed school after school hours to all groups except the Scouts and athletic groups).

I hasten to add that in my view the facts of this case pose a troubling, difficult and close question. Moreover, I wish to make it clear that this opinion should not be construed as implying that the challenged policy is a good policy. Still further, this opinion should not be interpreted to mean that the school was constitutionally compelled to allow the Gideons or anyone else to distribute religious materials at the school (on a sidewalk or otherwise). Finally, and most importantly, my ruling in this case is, of course, limited to the peculiar facts of this case.

I do not reach the other arguments raised by the defendants since the resolution of the merits of this case moots those arguments.

## I. UNDISPUTED MATERIAL FACTS

I find that the following are the undisputed material facts of this case:

1. This suit was filed on November 15, 1993. (Filing 1.)

2. The plaintiff is and was a resident of the school district. (Charles Schanou Dep., Tr. 4:21–23.)

3. The defendants are respectively a local school district, current and former members of the board of education, and Dennis Nosal, superintendent of the school district, with the individual defendants being named in their official and individual capacities. (Filing 1, Compl. ¶ 1.)

4. The school district is situated in rural Lancaster County, Nebraska, and it educates public school students from kindergarten through twelfth grade. (Ex. 101, Nosal Aff. ¶¶ 1–3.)

a. The school district serves various communities with small populations including Hickman, Firth, Panama, Holland, Cortland, Roca and Princeton. (*Id.*)

b. None of these small communities have meeting and related facilities with a capacity as large as the school district's facilities. (*Id.*)

5. The school district educates about 600 elementary school students from kindergarten through fifth grade in one building, while the balance of the student body of approximately 750 students is educated in another building. (*Id.,* ¶ 2.)

6. The two school buildings are situated on the same tract of land and are within approximately 150 feet of each other. (*Id.*)

7. A public road passes near the grounds of the school, but the school grounds are not situated within the boundary of any city or town. (*Id.,* ¶¶ 2–3.)

8. There are sidewalks on the grounds of the school which do not connect with any other sidewalks situated off school grounds

since the school is four miles from the nearest town. (Nosal Dep., Tr. 26:8–16.)

9. With one exception regarding the Gideons discussed more fully later, the school district has never had a written policy declaring its premises open to the public. (*Id.*, Tr. 31:24–32:19.)

10. Since sometime between 1966 and 1970, when Nosal first came to the school, the school district board has had what Nosal described as an unwritten "open forum" or "public forum" policy. (*Id.*, Tr. 31:14–23.)

11. The "open forum" or "public forum" policy made the school grounds and facilities, including the walkways, available for use by any person or group after school hours. (Ex. 101, Nosal Aff. ¶ 4.)

12. Historically, various persons and groups have used the school grounds and facilities, including gospel singers, a state senator, church basketball leagues, Girl Scouts, Boy Scouts, the "Friends of Music Concert Series," midget football teams, Southeast Community College, and various other individuals and groups. (*Id.*)

a. Picnic tables have been placed in the elementary school playground area for use by the general public after school hours, and members of the public commonly use that playground area and the picnic tables as well as the sidewalks and driveways. (*Id.*)

b. Many of the trees on the school grounds have been marked with signs by the "Norris Forest" organization, and members of the public are allowed to walk on the school grounds after school hours to view the signs and trees. (*Id.*)

13. Nosal knows of no person or group who has ever been denied access to school facilities. (Nosal Dep., Tr. 95:8–15.)

14. Rent is normally charged only if the school incurs an unusual cost, such as when an additional custodian is needed. (*Id.*, Tr. 54:18–55:3.)

15. Nosal believed the school board adopted this "open forum" policy because "at that point [the school district] was just building the elementary and the secondary buildings and [the school board] wanted it used by the community for the PR factor that was needed in that district." (*Id.*, Tr. 32:8–15.)

16. When a group is known to be using school facilities after school hours, it is common practice for announcements to be made to students over the intercom or in the classroom by school personnel, near the end of the school day, stating that an activity is to be held, scheduled or cancelled. (Silletto Dep., Tr. 8:20–9:14.)

17. The Gideons International (Gideons) is a group which has as its purpose the distribution of Bibles to fifth grade students and others throughout the community, and while the Gideons normally place the Bibles on a table so the children can pick up a Bible, the "Gideons do not generally hand Gideon Bibles to students, and also do not lecture or otherwise engage in discussions with students other than, generally, to tell the students that the Gideon Bibles are free." (Ex. 103, Hartman Aff. ¶ 2.)

18. The Gideons had distributed Bibles at the school, once a year to fifth graders, for a long time, and most of the time the Gideons distributed Bibles at the school outside the building on the sidewalk. (Nosal Dep., Tr. 35:4–24.)

19. Sometime in the mid–1980's, Nosal learned that the Gideons had distributed Bibles after school, but in a hall in the elementary school, because the principal "felt that [the distribution on the outside of the building] was creating confusion with students after school was out when they were going to the bus." (*Id.*, Tr. 38:11–14.)

20. When Nosal learned of this practice, he instructed the principal "if there was going to be a distribution it would be outside the school." (*Id.*, Tr. 39:9–40:10.)

21. Other groups, such as the Boy Scouts and Girl Scouts, have distributed their literature after school hours and on school grounds apparently so they might gain access to the students as they leave school. (*Id.*, Tr. 88:8–14.)

22. No school district funds have ever been expended in connection with the Gideons' use of the school grounds, and school personnel have never been permitted to dis-

tribute Gideon Bibles to the students. (Ex. 101, Nosal Aff. ¶ 5.)

23. The plaintiff was a member of the board of education of the school district from January, 1989, to February, 1990. (Filing 1, Compl. ¶¶ 11, 19.)

24. In January, 1989, the Gideons approached Nosal and once again requested permission to distribute Bibles, noting that they wanted to distribute Bibles to both fifth and sixth grade students because they had not distributed Bibles at school the previous year. (Nosal Dep., Tr. 41:2–42:9.)

25. In a very brief statement to the school board, of which the plaintiff was then a member, Nosal reported that the "Gideons would like to distribute Bibles again this year" and that "we can do this because Norris Public Schools is an open forum district." (Charles Schanou Dep., Tr. 16:12–19.)

26. In May, 1989, the plaintiff's only son, Jace Schanou, then a sixth-grade student enrolled in middle school (the middle school and high school are in the same building), picked up a Gideon Bible from a display table in the hallway in the middle school at the end of the school day after the bell had rung. (Jace Schanou Dep., Tr. 6:22–24; 7:15–19; 23:5–13.)

27. At this same time (May of 1989), the Gideons distributed Bibles at the elementary school outside the building on the sidewalk. (Nosal Dep., Tr. 44:23–45:10.)

28. The fact that the Gideons distributed their Bibles after school in the hallway of the middle school violated Nosal's directive that such activity take place outside the school building. (Id., Tr. 79:6–82:7.)

29. The plaintiff voiced concern about the constitutionality of allowing the Gideons to distribute Bibles on the school grounds at school board meetings in November and December, 1989, but never moved to stop the practice. (Charles Schanou Dep., Tr. 23:14–26:15.)

30. In an apparent response to the plaintiff's concerns, Nosal sent a memo to the school board on November 15, 1989, which discussed the constitutionality of allowing the distribution of Bibles on school property, at-

tached an opinion on the subject from the school's lawyers, stated that he believed the school had created a "public forum," and concluded that "unless directed otherwise by the Board of Education, I will inform the principal involved to continue the program in the same manner as discussed at the board meeting this past spring." (Nosal Dep., Tr. 50:9–55:3; Dep. Exs. 4, 5.)

31. Nosal believed the "same manner" was that the Gideons could distribute Bibles after school hours on the sidewalk outside the elementary school building. (Id., Tr. 63:5–9; 79:13–20.)

32. The plaintiff resigned from the school board in February, 1990, stating during his deposition that he resigned because the board was not supporting the constitutions of the United States and the State of Nebraska and also stating during the deposition that he was facing a recall election at the time of his resignation. (Charles Schanou Dep., Tr. 10:14–23.)

33. The plaintiff caused his son Jace Schanou to be removed from the Norris Public Schools during the last week of the spring term of his seventh-grade year in late May, 1990. (Charles Schanou Aff., ¶ 13; Charles Schanou Dep., Tr. 14:15–15:15.)

34. The plaintiff enrolled his son in Lefler Junior High School, Lincoln, Nebraska, for the remainder of the 1989–90 school year. (Charles Schanou Dep., Tr. 15:9–13.)

35. On October 11, 1990, the school board passed a motion stating that the school would "allow the distribution of Gideon Bibles to 5th grade students on a voluntary basis, provided the distribution table is set up outside the elementary school building." (Nosal Dep., Tr. 69:8–70:11; Dep. Ex. 8.)

36. At all times since October 11, 1990, the Gideons have distributed Bibles in a manner consistent with the policy adopted by the board on October 11, 1990, with the exception of the 1993–94 school year when the Gideons, as a result of this litigation, voluntarily ceased their activities. (Ex. 103, Hartman Aff., ¶ 2.)

37. The head fifth-grade teacher testified with regard to the once-a-year distribution of

Bibles by the Gideons that since at least 1989:

a. As a matter of school policy, the fifth-grade teachers announced near the end of the school day that the Gideons would be present to make Bibles available to fifth-grade students, but the students were also "very definitely" told they were not obligated to take a Bible. (Silletto Dep., Tr. 11:11–12:14.)

b. The announcement was made once at the end of the day "so that they would know what was going on." (*Id.*, Tr. 12:19–24.)

c. There were two sidewalks that provided an exit from the elementary school building, the "straight" sidewalk and the "diagonal" sidewalk, with most students using the diagonal sidewalk. (*Id.*, Tr. 15:5–9.)

d. The Gideons used the "straight" sidewalk. (*Id.*)

e. The straight sidewalk was a wide sidewalk. (*Id.*, Tr. 15:22.)

f. The Gideons placed the Bibles on a table, did not thrust the Bibles at the children, and did not "proselytize . . . at all." (*Id.*, Tr. 16:10–17:10.)

g. One or two fifth-grade teachers walked with the students as they left the school building. (*Id.*, Tr. 7:6–14; Dep. Ex. 13, Silletto Aff. ¶ 3.)

## II. APPLICATION OF LAW TO FACTS

It is necessary to characterize the plaintiff's complaint properly in order to correctly apply the law to the facts of this case. The complaint alleges that the plaintiff's rights were violated when two things happened: (1) the Gideons distributed the Bible to his sixth-grade son in the hallway of the middle school in May, 1989, and (2) the plaintiff, a school board member, brought the matter to the attention of the school board and Nosal but the defendants wrongfully refused to stop the general Bible distribution practice, thereby causing the plaintiff to resign from the board and remove his child from school. These two related acts comprise the essence of the plaintiff's complaint. (Filing 1 ¶ 20.)

With this understanding of the plaintiff's complaint in mind, I turn to a resolution of the merits of this case.

## A. THE SCHOOL'S POLICY

It is important to recognize what is, and is not, the policy of the defendant school district and the individual defendants. It is not now, and never has been, the policy of any of these defendants to allow distribution of Bibles *in the hallway* of a school building at any time. It is now, and apparently always has been, the policy of these defendants to allow distribution of Bibles by the Gideons to fifth-grade students (and once to sixth-grade students), but only when such distribution takes place on a sidewalk after school.

## B. DISTRIBUTION TO JACE IN THE HALLWAY WAS NOT AUTHORIZED

While Nosal authorized the Gideons to distribute Bibles to the sixth graders in 1989, while the remaining defendants were generally aware that the distribution would take place, and while this authorization was consistent with the school's past practice, none of the defendants authorized the distribution to take place in the school building.[2] Coun-

---

**2.** There is nothing *generally* inconsistent with Nosal's belief that he was compelled to allow the distribution but could impose reasonable restrictions. Even in traditional public fora situations, a governmental body has the right to impose reasonable "time, place and manner" regulations necessary to further significant governmental interests. *Grayned v. City of Rockford*, 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972) (upholding anti-noise ordinance which prohibited persons on public way adjacent to school from making noises which disturbed school). However, if the school were really a traditional public forum, it is at least questionable whether the school could limit the Gideons to

a table: "For in a traditional public forum such as a street or park the government may not confine to tables persons who wish to distribute literature, even if tables serve purposes such as controlling congestion or litter." *Hedges v. Wauconda Community Sch. Dist. 118*, 9 F.3d 1295, 1300 (7th Cir.1993). On the other hand, when the governmental body, such as a school district, is dealing with a nonpublic forum, its powers are expansive. *Lamb's Chapel*, —— U.S. at ——, 113 S.Ct. at 2147 ("With respect to public property that is not a designated public forum open for indiscriminate public use for communicative purposes, we have said that '[c]ontrol over access to a nonpublic forum can be based on subject

sel for the plaintiff essentially conceded as much at oral argument. (Filing 60, Tr. 3:10–4:7.) In addition, the evidence reveals that the in-hall distribution violated Nosal's previously expressed directions. Moreover, there is no evidence that any of the defendants subsequently ratified or approved the in-hall distribution. Thus, the distribution to the plaintiff's son in the middle-school hallway was both unintended and unauthorized by the defendants.

■ Even if an authorized distribution to Jace in the school building would have violated the Establishment Clause under *Lemon* (and I think a compelling argument can be made in this regard), the distribution would not be actionable in this case because: (1) historically, the distributions took place outside the school building, (Pt. I, Finding 18); (2) the hallway distribution clearly violated Nosal's previously announced interpretation of the school board policy that if Bible distributions were to take place, they would occur outside the school building, (Pt. I, Findings 19–20); and (3) when the school board was specifically confronted with the issue, it declared in a formal motion that the activity could only take place outside the school building. (Pt. I, Finding 35.)

Simply put, there is no vicarious liability under section 1983. Since there is no evidence that any of the defendants, including the school district as an entity, performed, authorized, or ratified the alleged wrong, the defendants can have no liability for the distribution to Jace. *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) (holding that a "governmental entity is liable under § 1983 only when the entity is a 'moving force' behind the deprivation"); *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 692, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978) (the language of section 1983 cannot be read to impose vicarious liability on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor); *Rizzo v. Goode*, 423 U.S. 362, 370–71, 96 S.Ct. 598, 603–04, 46 L.Ed.2d 561 (1976) (there must be

an affirmative link between the adopted plan or policy and the unconstitutional conduct showing "their authorization or approval of such misconduct" in order for defendants who did not actually perform the illegal acts to have liability under 42 U.S.C. § 1983).

### C. *LAMB'S CHAPEL* APPLIES BUT "FORUM" LABEL NOT DISPOSITIVE

With regard to actual school policy, the defendants argue that the school district's premises have become a "public forum" *after school hours,* and, as such, the defendants are precluded from prohibiting the Gideons from using the school's premises to distribute Bibles to children. They rely heavily upon *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* —— U.S. ——, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (holding that school district violated Free Speech Clause of First Amendment in denying church access to school facilities after school hours solely because the film the church wished to show dealt with religion when school was open after hours to civic groups, and further holding that allowing the church access to the school did not violate the Establishment Clause).

While I agree that *Lamb's Chapel* applies in this case, I think it doubtful that the school (including its sidewalks) was either a "traditional public forum" or a "designated public forum" as those phrases are properly understood in the Supreme Court's First Amendment jurisprudence. *See International Soc'y for Krishna Consciousness v. Lee,* —— U.S. ——, ——-——, 112 S.Ct. 2701, 2705–06, 120 L.Ed.2d 541 (1992) (Kennedy, La Guardia, and Newark airport terminals were neither "traditional" nor "designated" "public fora" and thus ban on solicitation need only satisfy a reasonableness standard).

Schools have normally not been considered either "traditional" or "designated" public fora. *Lamb's Chapel,* —— U.S. at ——, 113 S.Ct. at 2146; *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).

matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint

neutral.'") (quoting *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 806, 105 S.Ct. 3439, 3451, 87 L.Ed.2d 567 (1985)).

Simply allowing the public to enter a school's premises at given hours does not turn the school into a public forum. *International Soc'y for Krishna Consciousness*, —— U.S. at ——, 112 S.Ct. at 2706. Indeed, as the Court observed in a military-base situation, the mere fact that the base commander permitted "a civilian lecture on drug abuse, a religious service by a visiting preacher, or a rock musical concert" does not "convert [the property] into a public forum." *Greer v. Spock*, 424 U.S. 828, 838 n. 10, 96 S.Ct. 1211, 1217 n. 10, 47 L.Ed.2d 505 (1976). The essential question is not whether the public has been invited to come in or on the public property but whether the governmental body "intentionally" opened the property "for public discourse." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985).

In any event, it is not necessary to determine in this case, as it was not necessary to determine in *Lamb's Chapel*, —— U.S. at —————, 113 S.Ct. at 2146–47, whether the school has created a public forum. In *Lamb's Chapel* the Court made it quite clear that whatever the type of "forum," it was appropriate to apply the test in *Lemon* when confronted with an Establishment Clause claim or defense. The Court stated:

> permitting District property to be used to exhibit the film involved in this case would not have been an establishment of religion under the three-part test articulated in *Lemon v. Kurtzman*, 403 U.S. 602 [91 S.Ct. 2105, 29 L.Ed.2d 745] (1971): The challenged governmental action has a secular purpose, does not have the principal or primary effect of advancing or inhibiting religion, and does not foster an excessive entanglement with religion.

*Id.*, —— U.S. at ——, 113 S.Ct. at 2148 (footnote omitted).

■ Accordingly, I shall apply the *Lemon* test when judging the policy of the defendants without determining whether or not the school created a "public forum."[3] In so doing, I reject the defendants' arguments, and the cases cited by the defendants, suggesting that a school district may prevail in cases like this simply by labeling its premises, or some part thereof such as a sidewalk, a "public forum" and then claiming it was compelled to allow Bible distributions or other religious activities. *See, e.g., Bacon v. Bradley–Bourbonnais High Sch. Dist. No. 307*, 707 F.Supp. 1005, 1008 (C.D.Ill.1989) (holding that school district violated First Amendment by prohibiting Gideons from standing on school-owned sidewalk between curb and steps of high school and distributing Bibles because school's sidewalk was a "public forum"). As the United States Court of Appeals for the Seventh Circuit said in a similar, but not identical, case, "a public school cannot sanitize an endorsement of religion forbidden under the Establishment Clause by also sponsoring nonreligious speech." *Berger v. Rensselaer Cent. Sch. Corp.*, 982 F.2d 1160, 1168 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2344, 124 L.Ed.2d 254 (1993) (rejecting "public forum" arguments and holding that classroom distribution of Gideon Bibles to fifth graders during school hours violated the Establishment Clause). *See United States v. Kokinda*, 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality opinion holding that postal sidewalk was not a traditional public forum nor had Postal Service expressly dedicated sidewalk to an expressive activity).

## D. AFTER–HOURS SIDEWALK BIBLE–DISTRIBUTION POLICY PASSES *LEMON*

The challenged policy passes the *Lemon* test because it has a secular purpose, does

**3.** As there is no written policy on the school's "public forum" policy generally, I think it prudent to limit any finding by the court in this matter. The *specific* policy challenged by the plaintiff—the written policy on the Gideons—certainly did not facially create a "public forum." Indeed, the policy purports to exert controls over the Gideons which might be inconsistent with its argument that the school had created a public forum. *Hedges*, 9 F.3d at 1300. I thus assume, as did the Court in *Lamb's Chapel*, that the school did not have a public forum. This case illustrates the difficulty of using forum labels to resolve complex First Amendment arguments, particularly when one First Amendment doctrine may run headlong into another. *International Soc'y for Krishna Consciousness*, —— U.S. at —————, 112 S.Ct. at 2715–20 (Justice Kennedy, joined by Justices Blackmun, Stevens, and Souter, observed in a concurrence that "our public forum doctrine ought not to be a jurisprudence of categories rather than ideas....").

not have the principal or primary effect of advancing or inhibiting religion, and does not foster an excessive entanglement with religion. *Lemon,* 403 U.S. at 612–13, 91 S.Ct. at 2111. I reached this conclusion for the following reasons.

### 1. SECULAR PURPOSE

■ There is no evidence that the "public forum" policy which allowed the Gideons to distribute Bibles on the sidewalk after school was intended to do anything other than provide "PR," as Nosal rather indelicately put it, for the district. (Pt. I, Finding 15.)

The school district sought to foster by virtue of its "public forum" policy a sense of loyalty to the school. Given the fact that the district's pupils came from a rural setting comprised of numerous small towns and there was thus no natural sense of loyalty to the school, the school district had the secular (although perhaps quaint) goal of instilling in parents and students an affection for the school. The school district sought to inculcate this sense of loyalty by inviting its patrons to use school facilities after school hours for both religious and nonreligious activities.

Whether promoting school loyalty is a good reason for adopting the school's "public forum" policy generally, or the policy regarding the Gideons in particular, is not the question. The question is whether the purpose was and is secular. *See Edwards v. Aguillard,* 482 U.S. 578, 585–87, 599, 614–15, 107 S.Ct. 2573, 2578–80, 2586, 2594–95, 96 L.Ed.2d 510 (1987) (discussing the various views of the Justices on the meaning of secular). As I wrestled with this question, three things were especially significant to me: (1) there is no evidence that the Gideons, or any other religious group, initially lobbied for adoption of the district's historic "public forum" policy, (Pt. I, Finding 15); (2) when the specific question was first raised by the plaintiff, Nosal obtained an opinion from outside legal counsel, which opinion was entirely secular in nature, (Pt. I, Finding 30); and (3) there is nothing in the wording of the motion passed by the board regarding the Gideons to suggest that the purpose of the motion was religious in nature, and there is no evidence that the motion was adopted at the request of a religious group. (Pt. I, Finding 35.)

It is true that the only written policy the school board has adopted regarding its "public forum" deals with the Gideons. However, it is obvious that the school board adopted this specific policy not to promote religion generally or the Gideons in particular, but to document, in the face of the plaintiff's discontent, what the "public forum" policy was as applied to the source of the plaintiff's discontent. Moreover, the written policy was completely consistent with the school's past practice of allowing the Gideons to distribute Bibles after school, but only on the sidewalk. That practice was in turn simply a component of the more generalized historical practice of allowing school district patrons to use school facilities so that the school might enjoy good "PR." Thus, the fact that there is only one written policy, and that dealing with the Gideons, does not warrant the conclusion that the policy had a religious purpose.

Accordingly, I find and conclude that the purpose behind the "public forum" policy generally, and the specific policy regarding the Gideons, is and was entirely and thoroughly secular.

### 2. PRIMARY EFFECT

■ The second part of the *Lemon* test requires that I determine whether the primary effect of the school board's policy is to advance or inhibit religion. In this case, the specific claim of the plaintiff is that school policy places the school district's imprimatur upon religious activity, particularly in the eyes of the fifth-grade students. I have concluded that the "public forum" policy generally, and the Gideon policy specifically, neither advanced nor inhibited religion generally, or the religious beliefs of the Gideons specifically.

I note that the Supreme Court is not of one mind on this subject. *Hedges,* 9 F.3d at 1299 (commenting on the views of the Justices in such cases as *Lee v. Weisman,* —— U.S. ——, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)). Some of the Justices believe the proper inquiry is whether the activity constitutes an "endorsement" of religion (whether generally or specifically); if this view pre-

vails, a reviewing court must be concerned not only with whether the state action is coercive but also with appearances of state sponsorship. *Id.* Other Justices think the proper focus is limited to determining whether the state's conduct is coercive; if this view prevails, the question is simply whether the state's conduct imposes a particular religious belief, and appearances are not determinative. *Id.*

I have examined the facts under the assumption that the Establishment Clause is violated if either: (a) the policy actually imposes a religious belief on the students (generally or with regard to a particular religious point of view), or (b) the policy may appear to suggest a religious belief to the students (generally or with regard to a specific religious point of view). In so doing, I have examined whether there is or was overt support by the defendants for the Gideons or their message, whether there is or was tacit support by the defendants for the Gideons or their message, and, finally, whether the school children would likely perceive that the school endorsed the Gideons or their message in the absence of overt or tacit school support.

First, there is no overt activity by the defendants that promotes (or inhibits) religion generally or the Gideons specifically. For example, there is no evidence that the Bible-distribution policy was supported financially by the school, (Pt. I, Finding 22), that the district allowed its employees to assist in the distribution, (Pt. I, Finding 22), or that district employees made any positive or negative remarks to the students about the activity other than routine and content-neutral announcements at the end of the school day advising each student that the Gideons would be giving away Bibles but the students need not take one. (Pt. I, Findings 16, 35.)

Second, the school does not tacitly approve (or disapprove) of the Gideons, their message, or religion in general. This is *not* a case where the Gideons or any other religious group obtained school-approved access to the children in the school building during school hours. In such circumstances a school tacitly but actually places its "seal of approval" on religious activity. It does so by giving a religious group the school's time, supposedly dedicated exclusively to education during school hours, use of the school's facilities, also supposedly dedicated exclusively to education during school hours, and, most importantly, a captive audience of school children.

The case law is quite clear that where religious groups are allowed to enter a school building, particularly during instructional time, to hand out religious material to a captive audience of students, the school is tacitly but actually declaring that the religious message was sufficiently worthwhile that the school was willing to dedicate its time, property, and students to publication not only of the particular religious message being advanced, but religion in general. Such tacit, but very real, support for a religious point of view by a school violates the Establishment Clause. *See, e.g., Berger v. Rensselaer Cent. Sch. Corp.,* 982 F.2d at 1168–71 (classroom distribution of Gideon Bibles to fifth graders during school hours violated the Establishment Clause); *Goodwin v. Cross County Sch. Dist. No. 7,* 394 F.Supp. 417 (E.D.Ark.1973) (practice of Gideons speaking to fifth-grade class and then distributing Bibles and American flag in classroom violated the Establishment Clause). In this case, there is no such tacit but actual support for the Gideons, their message, or religion in general.

Third, viewed from the perspective of school children, particularly fifth graders, the school's policy distances the school from the Gideons and their message sufficiently that the children are likely to perceive the school is neutral. In this regard, I have taken to heart the plaintiff's concern (and that of some Supreme Court Justices) that fifth-grade students are impressionable. *Cf. Edwards v. Aguillard,* 482 U.S. at 583–84, 107 S.Ct. at 2577 ("The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools.... Students in such institutions are impressionable and their attendance is involuntary."). I am nevertheless persuaded that the fifth-grade students will not misunderstand the school's neutral position given the peculiar facts of this case.

The school has followed the suggestion of the United States Court of Appeals for the Seventh Circuit as to how a school system can avoid appearing to its students to have endorsed religion: "The principal method [for avoiding endorsement by the school] is for administrators to avoid endorsing religious views by their own words or deeds; a prudent administrator also might disclaim endorsement of private views expressed in the schools." *Hedges*, 9 F.3d at 1299. In this case, not only do the administrators and staff avoid any speech or conduct which could be perceived as the school's endorsement of a religious view, but the school affirmatively takes steps to disclaim any such implication which might arise simply because the Gideons are present on the sidewalk with their Bibles after school.

As a matter of policy, the students are "very definitely" told by their teachers just before they leave school for the day that while the Gideons will be offering free Bibles after school, the students are not obligated to take one. (Pt. I, Finding 37a.) Moreover, the students are not simply left to their own devices to fend off unwanted advances by the Gideons, but are escorted out of the school by one or two fifth-grade teachers. (Pt. I, Finding 37g.)

Still further, there is nothing about the actual practice of the Gideons in distributing the Bibles which would suggest to the students that their school is somehow endorsing the Gideons' point of view. The after-school distribution takes place on only one of two sidewalks, so the students can avoid the Gideons if they desire to do so. (Pt. I, Finding 37c.) In fact, the distributions take place on the least-used sidewalk. (*Id.*) Significantly, the distribution takes place on a "wide" sidewalk, and the Gideons place the Bibles on a table, do not thrust the Bibles at the children and do not "proselytize ... at all." (Pt. I, Findings 37e, 37f.) Nothing about the Gideons' actual practice suggests school sponsorship.

Even further, there is nothing unique about the children being told about the Gideons by their teachers or confronting the Gideons on the sidewalk after school which would suggest that the school endorsed the views of the Gideons or religion in general. It is quite common for announcements about all sorts of "after-school" activities to be made by the school. (Pt. I, Finding 16.) It is also quite common for the children to encounter diverse members of the public, including adults, after school.

For example, the children might encounter adults other than the Gideons walking to the picnic tables open to the public on the elementary school playground, (Pt. I, Finding 12a), or walking to the "Norris Forest," which is likewise open to the public. (Pt. I, Finding 12b.) It is equally possible the fifth graders would see Boy Scout groups or Girl Scout groups handing out literature on the sidewalks. (Pt. I, Finding 21.) The students might also see other adults walking into the school building to attend various after-school functions which are open to the public. (Pt. I, Finding 12.)

In sum, because there is no overt support for the Gideons (or religion generally), no tacit support for the Gideons (or religion generally), and no likelihood that the fifth graders will believe the school endorses the Gideons (or religion generally), I am persuaded that the school's policy passes the second prong of the *Lemon* test.

### 3. EXCESSIVE ENTANGLEMENT

■ I turn finally to the third prong of the *Lemon* test, that is, whether the policy of the school fosters excessive entanglement with religion. This prong reflects the "Madisonian concern that secular and religious authorities must not interfere with each other's respective spheres of choice and influence." *Lee v. Weisman*, —— U.S. at —— n. 3, 112 S.Ct. at 2663 n. 3 (Blackmun, J., concurring and providing a historical account of the development of the *Lemon* test). There is certainly no excessive entanglement between the school and the Gideons (or any other religious group) on the facts of this case.

The principal "sphere" of the school is to educate. The Gideons are in no way involved in the educational process; in fact, the Bible distributions take place after school outside the school building.

The principal "sphere" of the Gideons is to distribute Bibles. There is some "interfer-

ence" by the school in the sense that the school dictates that the distribution shall take place after school from a table on the sidewalk. But this time and place restriction in a school setting poses no unreasonable interference in the affairs of the Gideons. *Hedges*, 9 F.3d at 1300 (reversing district court and upholding distribution policy that required distribution before and after school from a table at or near main entrance to building).

Accordingly, the school's policy passes the third prong of the *Lemon* test.

### III. CONCLUSION

Because the distribution of a Bible to Jace Schanou was not authorized or ratified by the defendants, and because the actual policy of the defendants passes the *Lemon* test, summary judgment will be entered for the defendants and against the plaintiff, providing that the plaintiff shall take nothing and the complaint is dismissed on the merits.

IT IS ORDERED that:

(1) The plaintiff's motion for summary judgment (Filing 46) is denied;

(2) The defendants' motion for summary judgment (Filing 40) is granted on the merits;

(3) Summary judgment will be entered for the defendants and against the plaintiff by separate document, providing that the plaintiff shall take nothing and the complaint is dismissed on the merits.