## LAMB'S CHAPEL ET AL. *v.* CENTER MORICHES UNION FREE SCHOOL DISTRICT ET AL.

No. 91–2024.   Argued February 24, 1993—Decided June 7, 1993

*Jay Alan Sekulow* argued the cause for petitioners. With him on the briefs were *Keith A. Fournier, Mark N. Troobnick, James M. Henderson, Sr., Jordan W. Lorence, Thomas Patrick Monaghan, Walter M. Weber,* and *John Stepanovich.*

*John W. Hoefling* argued the cause for respondents. With him on the brief for respondents Center Moriches Union Free School District et al. was *Ross Paine Masler.* Respondent *Robert Abrams,* Attorney General of New York, filed a brief *pro se.* With him on the brief were *Jerry Boone,* Solic-

itor General, and *Lillian Z. Cohen* and *Jeffrey I. Slonim,*
Assistant Attorneys General.*

JUSTICE WHITE delivered the opinion of the Court.

New York Educ. Law § 414 (McKinney 1988 and Supp.
1993) authorizes local school boards to adopt reasonable reg-
ulations for the use of school property for 10 specified pur-
poses when the property is not in use for school purposes.
Among the permitted uses is the holding of "social, civic and
recreational meetings and entertainments, and other uses
pertaining to the welfare of the community; but such meet-
ings, entertainment and uses shall be non-exclusive and shall
be open to the general public." § 414(c).[1]   The list of per-
mitted uses does not include meetings for religious purposes,
and a New York appellate court in *Trietley* v. *Board of Ed.
of Buffalo,* 409 N. Y. S. 2d 912, 915 (App. Div. 1978), ruled
that local boards could not allow student bible clubs to meet

---

*Briefs of *amici curiae* urging reversal were filed for the United States
by *Solicitor General Starr, Assistant Attorney General Gerson, Deputy
Solicitor General Roberts, Edward C. DuMont, Anthony J. Steinmeyer,*
and *Lowell V. Sturgill, Jr.;* for the American Civil Liberties Union et al.
by *David H. Remes, T. Jeremy Gunn, Steven R. Shapiro, John A. Powell,*
and *Elliot M. Mincberg;* for the American Federation of Labor and Con-
gress of Industrial Organizations by *Robert M. Weinberg, Laurence Gold,*
and *Walter A. Kamiat;* for the Christian Legal Society et al. by *Kimberlee
Wood Colby, Steven T. McFarland, Bradley P. Jacob,* and *Karon Owen
Bowdre;* for Concerned Women for America et al. by *Wendell R. Bird* and
*David J. Myers;* for the National Jewish Commission on Law and Public
Affairs by *Nathan Lewin* and *Dennis Rapps;* and for the Rutherford Insti-
tute by *James J. Knicely* and *John W. Whitehead.*

*Jay Worona, Pilar Sokol,* and *Louis Grumet* filed a brief for the New
York State School Boards Association et al. as *amici curiae* urging
affirmance.

[1] Section 414(e) authorizes the use of school property "[f]or polling
places for holding primaries and elections and for the registration of voters
and for holding political meetings.   But no meetings sponsored by political
organizations shall be permitted unless authorized by a vote of a district
meeting, held as provided by law, or, in cities by the board of education
thereof."

on school property because "[r]eligious purposes are not included in the enumerated purposes for which a school may be used under section 414." In *Deeper Life Christian Fellowship, Inc.* v. *Sobol,* 948 F. 2d 79, 83–84 (1991), the Court of Appeals for the Second Circuit accepted *Trietley* as an authoritative interpretation of state law. Furthermore, the Attorney General of New York supports *Trietley* as an appropriate approach to deciding this case.

Pursuant to § 414's empowerment of local school districts, the Board of Center Moriches Union Free School District (District) has issued rules and regulations with respect to the use of school property when not in use for school purposes. The rules allow only 2 of the 10 purposes authorized by § 414: social, civic, or recreational uses (Rule 10) and use by political organizations if secured in compliance with § 414 (Rule 8). Rule 7, however, consistent with the judicial interpretation of state law, provides that "[t]he school premises shall not be used by any group for religious purposes." App. to Pet. for Cert. 57a.

The issue in this case is whether, against this background of state law, it violates the Free Speech Clause of the First Amendment, made applicable to the States by the Fourteenth Amendment, to deny a church access to school premises to exhibit for public viewing and for assertedly religious purposes, a film series dealing with family and child-rearing issues faced by parents today.

## I

Petitioners (Church) are Lamb's Chapel, an evangelical church in the community of Center Moriches, and its pastor John Steigerwald. Twice the Church applied to the District for permission to use school facilities to show a six-part film series containing lectures by Doctor James Dobson.[2] A bro-

---

[2] Shortly before the first of these requests, the Church had applied for permission to use school rooms for its Sunday morning services and for Sunday School. The hours specified were 9 a.m. to 1 p.m. and the time

388

chure provided on request of the District identified Dr. Dobson as a licensed psychologist, former associate clinical professor of pediatrics at the University of Southern California, best-selling author, and radio commentator. The brochure stated that the film series would discuss Dr. Dobson's views on the undermining influences of the media that could only be counterbalanced by returning to traditional, Christian family values instilled at an early stage. The brochure went on to describe the contents of each of the six parts of the series.[3] The District denied the first application, saying

period one year beginning in the next month. 959 F. 2d 381, 383 (CA2 1992). Within a few days the District wrote petitioners that the application "requesting use of the high school for your Sunday services" was denied, citing both N. Y. Educ. Law § 414 and the District's Rule 7 barring uses for religious purposes. The Church did not challenge this denial in the courts and the validity of this denial is not before us.

[3] *"Turn Your Heart Toward Home* is available now in a series of six discussion-provoking films:

"1) A FATHER LOOKS BACK emphasizes how swiftly time passes and appeals to all parents to 'turn their hearts toward home' during the all-important child-rearing years. *(60 minutes.)*

"2) POWER IN PARENTING: THE YOUNG CHILD begins by exploring the inherent nature of power, and offers many practical helps for facing the battlegrounds in child-rearing—bedtime, mealtime and other confrontations so familiar to parents. Dr. Dobson also takes a look at areas of conflict in marriage and other adult relationships. *(60 minutes.)*

"3) POWER IN PARENTING: THE ADOLESCENT discusses father/daughter and mother/son relationships, and the importance of allowing children to grow to develop as individuals. Dr. Dobson also encourages parents to free themselves of undeserved guilt when their teenagers choose to rebel. *(45 minutes.)*

"4) THE FAMILY UNDER FIRE views the family in the context of today's society, where a "civil war of values" is being waged. Dr. Dobson urges parents to look at the effects of governmental interference, abortion and pornography, and to get involved. To preserve what they care about most—their own families! *(52 minutes.)*

*Note: This film contains explicit information regarding the pornography industry. Not recommended for young audiences.*

"5) OVERCOMING A PAINFUL CHILDHOOD includes Shirley Dobson's intimate memories of a difficult childhood with her alcoholic

that "[t]his film does appear to be church related and therefore your request must be refused." App. 84. The second application for permission to use school premises for showing the film series, which described it as a "Family oriented movie—from a Christian perspective," *id.*, at 91, was denied using identical language.

The Church brought suit in the District Court, challenging the denial as a violation of the Freedom of Speech and Assembly Clauses, the Free Exercise Clause, and the Establishment Clause of the First Amendment, as well as the Equal Protection Clause of the Fourteenth Amendment. As to each cause of action, the Church alleged that the actions were undertaken under color of state law, in violation of 42 U. S. C. § 1983. The District Court granted summary judgment for respondents, rejecting all the Church's claims. With respect to the free-speech claim under the First Amendment, the District Court characterized the District's facilities as a "limited public forum." The court noted that the enumerated purposes for which § 414 allowed access to school facilities did not include religious worship or instruction, that Rule 7 explicitly proscribes using school facilities for religious purposes, and that the Church had conceded that its showing of the film series would be for religious purposes. 770 F. Supp. 91, 92, 98–99 (EDNY 1991). The District Court stated that once a limited public forum is opened to a particular type of speech, selectively denying access to other activities of the same genre is forbidden. *Id.*, at 99. Noting that the District had not opened its facilities to orga-

father. Mrs. Dobson recalls the influences which brought her to a loving God who saw her personal circumstances and heard her cries for help. *(40 minutes.)*

"6) THE HERITAGE presents Dr. Dobson's powerful closing remarks. Here he speaks clearly and convincingly of our traditional values which, if properly employed and defended, can assure happy, healthy, strengthened homes and family relationships in the years to come. *(60 minutes.)*" App. 87–88.

nizations similar to Lamb's Chapel for religious purposes, the District Court held that the denial in this case was viewpoint neutral and, hence, not a violation of the Freedom of Speech Clause. *Ibid.* The District Court also rejected the assertion by the Church that denying its application demonstrated a hostility to religion and advancement of nonreligion not justified under the Establishment of Religion Clause of the First Amendment. 736 F. Supp. 1247, 1253 (1990).

The Court of Appeals affirmed the judgment of the District Court "in all respects." 959 F. 2d 381, 389 (CA2 1992). It held that the school property, when not in use for school purposes, was neither a traditional nor a designated public forum; rather, it was a limited public forum open only for designated purposes, a classification that "allows it to remain non-public except as to specified uses." *Id.*, at 386. The court observed that exclusions in such a forum need only be reasonable and viewpoint neutral, *ibid.*, and ruled that denying access to the Church for the purpose of showing its film did not violate this standard. Because the holding below was questionable under our decisions, we granted the petition for certiorari, 506 U. S. 813 (1992), which in principal part challenged the holding below as contrary to the Free Speech Clause of the First Amendment.[4]

## II

There is no question that the District, like the private owner of property, may legally preserve the property under its control for the use to which it is dedicated. *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 800 (1985); *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 46 (1983); *Postal Service* v. *Council of Green-*

---

[4] The petition also presses the claim by the Church, rejected by both courts below, that the rejection of its application to exhibit its film series violated the Establishment Clause because it and Rule 7's categorical refusal to permit District property to be used for religious purposes demonstrate hostility to religion. Because we reverse on another ground, we need not decide what merit this submission might have.

*burgh Civic Assns.,* 453 U. S. 114, 129–130 (1981); *Greer* v. *Spock,* 424 U. S. 828, 836 (1976); *Adderley* v. *Florida,* 385 U. S. 39, 47 (1966). It is also common ground that the District need not have permitted after-hours use of its property for any of the uses permitted by N. Y. Educ. Law § 414. The District, however, did open its property for 2 of the 10 uses permitted by § 414. The Church argued below that because under Rule 10 of the rules issued by the District, school property could be used for "social, civic, and recreational" purposes, the District had opened its property for such a wide variety of communicative purposes that restrictions on communicative uses of the property were subject to the same constitutional limitations as restrictions in traditional public forums such as parks and sidewalks. Hence, its view was that subject matter or speaker exclusions on District property were required to be justified by a compelling state interest and to be narrowly drawn to achieve that end. See *Perry, supra,* at 45; *Cornelius, supra,* at 800. Both the District Court and the Court of Appeals rejected this submission, which is also presented to this Court. The argument has considerable force, for the District's property is heavily used by a wide variety of private organizations, including some that presented a "close question," which the Court of Appeals resolved in the District's favor, as to whether the District had in fact already opened its property for religious uses. 959 F. 2d, at 387.[5] We need

---

[5] In support of its case in the District Court, the Church presented the following sampling of the uses that had been permitted under Rule 10 in 1987 and 1988:

"A New Age religious group known as the 'Mind Center'
Southern Harmonize Gospel Singers
Salvation Army Youth Band
Hampton Council of Churches' Billy Taylor Concert
Center Moriches Co-op Nursery School's Quilting Bee
Manorville Humane Society's Chinese Auction
Moriches Bay Power Squadron

392

not rule on this issue, however, for even if the courts below were correct in this respect—and we shall assume for present purposes that they were—the judgment below must be reversed.

With respect to public property that is not a designated public forum open for indiscriminate public use for communicative purposes, we have said that "[c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in

---

Unkechaug Dance Group
Paul Gibson's Baseball Clinic
Moriches Bay Civic Association
Moriches Chamber of Commerce's Town Fair Day
Center Moriches Drama Club
Center Moriches Music Award Associations' 'Amahl & the Night Visitors'
Saint John's Track and Field Program
Girl Scouts of Suffolk [C]ounty
Cub Scouts Pack 23
Boy Scout Troop #414." 770 F. Supp. 91, 93, n. 4 (EDNY 1991).
The Church claimed that the first three uses listed above demonstrated that Rule 10 actually permitted the District property to be used for religious purposes as well as a great assortment of other uses. The first item listed is particularly interesting and relevant to the issue before us. The District Court referred to this item as "a lecture series by the Mind Center, purportedly a New Age religious group." Id., at 93. The Court of Appeals described it as follows:
"The lecture series, 'Psychology and The Unknown,' by Jerry Huck, was sponsored by the Center Moriches Free Public Library. The library's newsletter characterized Mr. Huck as a psychotherapist who would discuss such topics as parapsychology, transpersonal psychology, physics and metaphysics in his 4-night series of lectures. Mr. Huck testified that he lectured principally on parapsychology, which he defined by 'reference to the human unconscious, the mind, the unconscious emotional system or the body system.' When asked whether his lecture involved matters of both a spiritual and a scientific nature, Mr. Huck responded: 'It was all science. Anything I speak on based on parapsychology, analytic, quantum physicists [sic].' Although some incidental reference to religious matters apparently was made in the lectures, Mr. Huck himself characterized such matters as 'a fascinating sideline' and 'not the purpose of the [lecture].' " 959 F. 2d, at 388.

light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U. S., at 806, citing *Perry Education Assn., supra*, at 49. The Court of Appeals appeared to recognize that the total ban on using District property for religious purposes could survive First Amendment challenge only if excluding this category of speech was reasonable and viewpoint neutral. The court's conclusion in this case was that Rule 7 met this test. We cannot agree with this holding, for Rule 7 was unconstitutionally applied in this case.[6]

The Court of Appeals thought that the application of Rule 7 in this case was viewpoint neutral because it had been, and would be, applied in the same way to all uses of school property for religious purposes. That all religions and all uses for religious purposes are treated alike under Rule 7, however, does not answer the critical question whether it discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and child rearing except those dealing with the subject matter from a religious standpoint.

There is no suggestion from the courts below or from the District or the State that a lecture or film about child rearing and family values would not be a use for social or civic purposes otherwise permitted by Rule 10. That subject matter is not one that the District has placed off limits to any and all speakers. Nor is there any indication in the record before us that the application to exhibit the particular film series involved here was, or would have been, denied for any reason other than the fact that the presentation would have

---

[6] Although the Court of Appeals apparently held that Rule 7 was reasonable as well as viewpoint neutral, the court uttered not a word in support of its reasonableness holding. If Rule 7 were to be held unreasonable, it could be held facially invalid, that is, it might be held that the rule could in no circumstances be applied to religious speech or religious communicative conduct. In view of our disposition of this case, we need not pursue this issue.

been from a religious perspective. In our view, denial on that basis was plainly invalid under our holding in *Cornelius, supra,* at 806, that

> "[a]lthough a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum . . . or if he is not a member of the class of speakers for whose especial benefit the forum was created . . . , the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject."

The film series involved here no doubt dealt with a subject otherwise permissible under Rule 10, and its exhibition was denied solely because the series dealt with the subject from a religious standpoint. The principle that has emerged from our cases "is that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *City Council of Los Angeles* v. *Taxpayers for Vincent,* 466 U. S. 789, 804 (1984). That principle applies in the circumstances of this case; as Judge Posner said for the Court of Appeals for the Seventh Circuit, to discriminate "against a particular point of view . . . would . . . flunk the test . . . [of] *Cornelius,* provided that the defendants have no defense based on the establishment clause." *May* v. *Evansville-Vanderburgh School Corp.,* 787 F. 2d 1105, 1114 (1986).

The District, as a respondent, would save its judgment below on the ground that to permit its property to be used for religious purposes would be an establishment of religion forbidden by the First Amendment. This Court suggested in *Widmar* v. *Vincent,* 454 U. S. 263, 271 (1981), that the interest of the State in avoiding an Establishment Clause violation "may be [a] compelling" one justifying an abridgment of free speech otherwise protected by the First Amendment; but the Court went on to hold that permitting use of univer-

sity property for religious purposes under the open access policy involved there would not be incompatible with the Court's Establishment Clause cases.

We have no more trouble than did the *Widmar* Court in disposing of the claimed defense on the ground that the posited fears of an Establishment Clause violation are unfounded. The showing of this film series would not have been during school hours, would not have been sponsored by the school, and would have been open to the public, not just to church members. The District property had repeatedly been used by a wide variety of private organizations. Under these circumstances, as in *Widmar*, there would have been no realistic danger that the community would think that the District was endorsing religion or any particular creed, and any benefit to religion or to the Church would have been no more than incidental. As in *Widmar, supra,* at 271–272, permitting District property to be used to exhibit the film series involved in this case would not have been an establishment of religion under the three-part test articulated in *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971): The challenged governmental action has a secular purpose, does not have the principal or primary effect of advancing or inhibiting religion, and does not foster an excessive entanglement with religion.[7]

The District also submits that it justifiably denied use of its property to a "radical" church for the purpose of proselytizing, since to do so would lead to threats of public unrest and even violence. Brief for Respondent Center Moriches

---

[7] While we are somewhat diverted by JUSTICE SCALIA's evening at the cinema, *post,* at 398–399, we return to the reality that there is a proper way to inter an established decision and *Lemon,* however frightening it might be to some, has not been overruled. This case, like *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos,* 483 U. S. 327 (1987), presents no occasion to do so. JUSTICE SCALIA apparently was less haunted by the ghosts of the living when he joined the opinion of the Court in that case.

Union Free School District et al. 4–5, 11–12, 24. There is nothing in the record to support such a justification, which in any event would be difficult to defend as a reason to deny the presentation of a religious point of view about a subject the District otherwise opens to discussion on District property.

We note that the New York State Attorney General, a respondent here, does not rely on either the Establishment Clause or possible danger to the public peace in supporting the judgment below. Rather, he submits that the exclusion is justified because the purpose of the access rules is to promote the interests of the public in general rather than sectarian or other private interests. In light of the variety of the uses of District property that have been permitted under Rule 10, this approach has its difficulties. This is particularly so since Rule 10 states that District property may be used for social, civic, or recreational use "only if it can be non-exclusive and open to all residents of the school district that form a homogeneous group deemed relevant to the event." App. to Pet. for Cert. 57a. At least arguably, the Rule does not require that permitted uses need be open to the public at large. However that may be, this was not the basis of the judgment that we are reviewing. The Court of Appeals, as we understand it, ruled that because the District had the power to permit or exclude certain subject matters, it was entitled to deny use for any religious purpose, including the purpose in this case. The Attorney General also defends this as a permissible subject-matter exclusion rather than a denial based on viewpoint, a submission that we have already rejected.

The Attorney General also argues that there is no express finding below that the Church's application would have been granted absent the religious connection. This fact is beside the point for the purposes of this opinion, which is concerned with the validity of the stated reason for denying the

Church's application, namely, that the film series sought to be shown "appeared to be church related."

For the reasons stated in this opinion, the judgment of the Court of Appeals is

*Reversed.*

JUSTICE KENNEDY, concurring in part and concurring in the judgment.

Given the issues presented as well as the apparent unanimity of our conclusion that this overt, viewpoint-based discrimination contradicts the Free Speech Clause of the First Amendment and that there has been no substantial showing of a potential Establishment Clause violation, I agree with JUSTICE SCALIA that the Court's citation of *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971), is unsettling and unnecessary. The same can be said of the Court's use of the phrase "endorsing religion," see *ante*, at 395, which, as I have indicated elsewhere, cannot suffice as a rule of decision consistent with our precedents and our traditions in this part of our jurisprudence. See *Allegheny County* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 655 (1989) (opinion concurring in judgment in part and dissenting in part). With these observations, I concur in part and concur in the judgment.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in the judgment.

I join the Court's conclusion that the District's refusal to allow use of school facilities for petitioners' film viewing, while generally opening the schools for community activities, violates petitioners' First Amendment free-speech rights (as does N. Y. Educ. Law § 414 (McKinney 1988 and Supp. 1993), to the extent it compelled the District's denial, see *ante*, at 386–387). I also agree with the Court that allowing Lamb's Chapel to use school facilities poses "no realistic danger" of a violation of the Establishment Clause, *ante*, at

395, but I cannot accept most of its reasoning in this regard. The Court explains that the showing of petitioners' film on school property after school hours would not cause the community to "think that the District was endorsing religion or any particular creed," and further notes that access to school property would not violate the three-part test articulated in *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971). *Ante*, at 395.

As to the Court's invocation of the *Lemon* test: Like some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried, *Lemon* stalks our Establishment Clause jurisprudence once again, frightening the little children and school attorneys of Center Moriches Union Free School District. Its most recent burial, only last Term, was, to be sure, not fully six feet under: Our decision in *Lee* v. *Weisman*, 505 U. S. 577, 586–587 (1992), conspicuously avoided using the supposed "test" but also declined the invitation to repudiate it. Over the years, however, no fewer than five of the currently sitting Justices have, in their own opinions, personally driven pencils through the creature's heart (the author of today's opinion repeatedly), and a sixth has joined an opinion doing so. See, *e. g.*, *Weisman, supra*, at 644 (SCALIA, J., joined by, *inter alios*, THOMAS, J., dissenting); *Allegheny County* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 655–657 (1989) (KENNEDY, J., concurring in judgment in part and dissenting in part); *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos*, 483 U. S. 327, 346–349 (1987) (O'CONNOR, J., concurring in judgment); *Wallace* v. *Jaffree*, 472 U. S. 38, 107–113 (1985) (REHNQUIST, J., dissenting); *id.*, at 90–91 (WHITE, J., dissenting); *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373, 400 (1985) (WHITE, J., dissenting); *Widmar* v. *Vincent*, 454 U. S. 263, 282 (1981) (WHITE, J., dissenting); *New York* v. *Cathedral Academy*, 434 U. S. 125,

134–135 (1977) (WHITE, J., dissenting); *Roemer* v. *Board of Pub. Works of Md.,* 426 U. S. 736, 768 (1976) (WHITE, J., concurring in judgment); *Committee for Public Ed. & Religious Liberty* v. *Nyquist,* 413 U. S. 756, 820 (1973) (WHITE, J., dissenting).

The secret of the *Lemon* test's survival, I think, is that it is so easy to kill. It is there to scare us (and our audience) when we wish it to do so, but we can command it to return to the tomb at will. See, *e. g., Lynch* v. *Donnelly,* 465 U. S. 668, 679 (1984) (noting instances in which Court has not applied *Lemon* test). When we wish to strike down a practice it forbids, we invoke it, see, *e. g., Aguilar* v. *Felton,* 473 U. S. 402 (1985) (striking down state remedial education program administered in part in parochial schools); when we wish to uphold a practice it forbids, we ignore it entirely, see *Marsh* v. *Chambers,* 463 U. S. 783 (1983) (upholding state legislative chaplains). Sometimes, we take a middle course, calling its three prongs "no more than helpful signposts," *Hunt* v. *McNair,* 413 U. S. 734, 741 (1973). Such a docile and useful monster is worth keeping around, at least in a somnolent state; one never knows when one might need him.

For my part, I agree with the long list of constitutional scholars who have criticized *Lemon* and bemoaned the strange Establishment Clause geometry of crooked lines and wavering shapes its intermittent use has produced. See, *e. g.,* Choper, The Establishment Clause and Aid to Parochial Schools—An Update, 75 Calif. L. Rev. 5 (1987); Marshall, "We Know It When We See It": The Supreme Court and Establishment, 59 S. Cal. L. Rev. 495 (1986); McConnell, Accommodation of Religion, 1985 S. Ct. Rev. 1; Kurland, The Religion Clauses and the Burger Court, 34 Cath. U. L. Rev. 1 (1984); R. Cord, Separation of Church and State (1982); Choper, The Religion Clauses of the First Amendment: Reconciling the Conflict, 41 U. Pitt. L. Rev. 673 (1980). I will decline to apply *Lemon*—whether it vali-

dates or invalidates the government action in question—and therefore cannot join the opinion of the Court today.*

I cannot join for yet another reason: the Court's statement that the proposed use of the school's facilities is constitutional because (among other things) it would not signal endorsement of religion in general. *Ante,* at 395. What a strange notion, that a Constitution which *itself* gives "religion in general" preferential treatment (I refer to the Free Exercise Clause) forbids endorsement of religion in general. The attorney general of New York not only agrees with that strange notion, he has an explanation for it: "Religious advocacy," he writes, "serves the community only in the eyes of its adherents and yields a benefit only to those who already believe." Brief for Respondent Attorney General 24. That was *not* the view of those who adopted our Constitution, who believed that the public virtues inculcated by religion are a public good. It suffices to point out that during the summer of 1789, when it was in the process of drafting the First Amendment, Congress enacted the Northwest Territory Ordinance that the Confederation Congress had adopted in 1787—Article III of which provides: "Religion, morality, and knowledge, *being necessary to good government and the happiness of mankind,* schools and the means of education shall forever be encouraged." Unsurprisingly, then, indifference to "religion in general" is *not* what our cases, both old and recent, demand. See, *e. g., Zorach* v. *Clauson,* 343 U. S. 306, 313–314 (1952) ("When the state encourages reli-

---

*The Court correctly notes, *ante,* at 395, n. 7, that I joined the opinion in *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos,* 483 U. S. 327 (1987), which considered the *Lemon* test. Lacking a majority at that time to abandon *Lemon,* we necessarily focused on that test, which had been the exclusive basis for the lower court's judgment. Here, of course, the lower court did not mention *Lemon,* and indeed did not even address any Establishment Clause argument on behalf of respondents. Thus, the Court is ultimately correct that *Presiding Bishop* provides a useful comparison: It was as impossible to avoid *Lemon* there, as it is unnecessary to inject *Lemon* here.

gious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions"); *Walz* v. *Tax Comm'n of New York City*, 397 U. S. 664 (1970) (upholding property tax exemption for church property); *Lynch*, 465 U. S., at 673 (the Constitution "affirmatively mandates accommodation, not merely tolerance, of all religions . . . . Anything less would require the 'callous indifference' we have said was never intended" (citations omitted)); *id.*, at 683 ("[O]ur precedents plainly contemplate that on occasion some advancement of religion will result from governmental action"); *Marsh*, *supra; Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos*, 483 U. S. 327 (1987) (exemption for religious organizations from certain provisions of Civil Rights Act).

\*     \*     \*

For the reasons given by the Court, I agree that the Free Speech Clause of the First Amendment forbids what respondents have done here.  As for the asserted Establishment Clause justification, I would hold, simply and clearly, that giving Lamb's Chapel nondiscriminatory access to school facilities cannot violate that provision because it does not signify state or local embrace of a particular religious sect.