67 F.3d 266
 95 Cal. Daily Op. Serv. 7981, 95 Daily Journal
D.A.R. 13,670
Albert J. KINDT, Plaintiff-Appellant,
v.
SANTA MONICA RENT CONTROL BOARD; Susan Packer Davis;
Dolores Press; Eileen Lipson; Wayne Bauer; Suzanne
Abrescia; Jay Johnson; Robert Niemann; Anthony
Trendacosta, as an Individual, Defendants-Appellees.
 No. 94-55479.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 5, 1995.
Decided Oct. 10, 1995.
 
 Brenda Powers Barnes, Los Angeles, California, for plaintiff-appellant.
 Ralph H. Goldsen, Anthony A. Trendacosta, Santa Monica Rent Control Board, Los Angeles, California, for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before: FLETCHER, WIGGINS, and FERNANDEZ, Circuit Judges.
 FERNANDEZ, Circuit Judge:
 
 
 1
 Albert J. Kindt, an owner of rental property, appeals the district court's summary judgment in favor of the Santa Monica Rent Control Board and its past and current members in his action under 42 U.S.C. Secs. 1983 and 1985. He claims that the defendants conspired to violate his First Amendment right to free speech by ejecting him from public board meetings and by discriminating between speakers who supported their views and speakers who opposed them. We affirm.
 
 BACKGROUND FACTS
 
 2
 Kindt is an owner of apartment buildings in Santa Monica, California, and a frequent participant in meetings of the Santa Monica Rent Control Board, an elected public body. Board regulations provide that any member of the public who wishes to address the Board on a particular item must fill out a slip of paper for that item (known as a "chit").[1] Speakers are then allowed to address the Board for three minutes in the order that their chits are drawn.
 
 
 3
 Before March 8, 1990, the Board allowed chits to be filed and heard on Items 1, 2, 4, 7, 8, 11, and 13. Quite a lot of discussion was generated during some of those items. For example, for several months three Board members refused to salute the flag during Item 1. They announced that they did so in protest of United States foreign aid to El Salvador. Kindt and other members of the public submitted chits asking to speak on Item 1. Kindt criticized the Board members' refusal to salute the flag. He also stated that a rent control board had no business addressing political issues of foreign policy.
 
 
 4
 Similar controversy arose during Item 4. First the chairperson of the Board would ask if any members had announcements. Board members regularly announced events such as abortion clinic defense sessions; meetings about several organized labor incidents, including the Eastern Airlines strike and the closure of the General Motors plant in Van Nuys; Fund for the Feminist Majority meetings; protests supporting the nuclear test ban; and demonstrations opposing the Persian Gulf War. Kindt would submit a chit to address the Board during Item 4. He would then castigate the Board for announcing matters that "had nothing to do with rent control."
 
 
 5
 Sometimes special guests would address the Board under Item 4. The record suggests that, in advance of the meeting itself, some of those guests had made requests to speak and that some were invited by the Board to speak on a particular topic. Speakers included a representative from the American Civil Liberties Union who requested a special resolution from the Board opposing the execution of Robert Harris; individuals discussing the Cambodian regime; and union representatives discussing the Greyhound Bus and Eastern Airlines strikes. Kindt vehemently objected to the propriety of bringing in speakers who did not have any apparent connection to rent control issues. Others also spoke to the issues under Items 1 and 4. The result was that those often tangential items disrupted the flow of Board proceedings and inconvenienced people, including several landlords, who were making appearances before the Board. They had to wait until the commentary and controversy under those items died down before they could transact their rent control business before the Board.
 
 
 6
 Then on March 1, 1990, the Board's general counsel Anthony Trendacosta announced that his review of the Brown Act[2] had led him to the conclusion that, in general, public discussion should be heard only under Item 13 (requests to speak to the Board). Excepted were certain Items that required public discussion pursuant to the Board's regulations, such as Item 7 (public hearings). From that point forward, the Board ceased to consider chits during Items 1 and 4; any public commentary on those Items was taken during Item 13. Kindt continued to submit chits on Items 1 and 4, and often loudly disrupted the meeting when he was not allowed to speak during those items. However, Kindt was not refused the right to speak when he submitted chits under Item 13.
 
 
 7
 Kindt was ejected from Board meetings on occasion. The record indicates that Kindt was disrupting the orderly process of the meeting when he was ejected. On one occasion he, and others, in the front row were asked to move when their comments were disturbing another member of the public who was addressing the Board. On that occasion a Board member stomped out because he thought that the offenders should have been ejected. On one other occasion Kindt and a cohort[3] had been disrupting the Board meeting. Kindt was warned that he would be ejected if he continued to disrupt the meeting. He was later ejected along with the cohort after a Board member thought that the cohort had made an obscene gesture toward him. Kindt was at that particular moment sitting docilely. The Board's Rules of Decorum, section 1017 of the Board regulations, provide for the removal of those who disrupt meetings.
 
 
 8
 Kindt then decided to move his dispute with the Board into a new arena by filing this action. The Board and the other defendants moved for summary judgment or, in the alternative, for summary adjudication of issues and on the date set for trial the district court granted summary judgment. This appeal followed.
 
 JURISDICTION AND STANDARD OF REVIEW
 
 9
 The district court had jurisdiction pursuant to 28 U.S.C. Sec. 1343. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291. A grant of summary judgment is reviewed de novo. Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994). The panel must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court properly applied the relevant substantive law. See id.
 
 DISCUSSION
 
 10
 Citizens are not entitled to exercise their First Amendment rights whenever and wherever they wish. See Adderley v. Florida, 385 U.S. 39, 47-48, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966) (trespass statute that prohibits demonstrating on jailhouse grounds does not violate the First Amendment). There are three recognized categories of permissible regulation of expressive activity. First is the so-called public forum, which is usually a street or park that has "immemorially been held in trust for the use of the public and, time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983) (quoting Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939)). In public fora, the state must demonstrate that a content-based regulation is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Id. at 45, 103 S.Ct. at 955. In addition, the state may impose time, place, and manner restrictions if they "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Id.
 
 
 11
 At the other end of the spectrum is the nonpublic forum, "which is not by tradition or designation a forum for public communication." Id. "In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Id.; see also Planned Parenthood v. Clark County Sch. Dist., 941 F.2d 817, 829-30 (9th Cir.1991) (en banc) (school district's refusal to accept advertisement for its school-sponsored publications that were not public fora comported with the First Amendment because it was reasonable and viewpoint-neutral).
 
 
 12
 In between lies the third category: the limited public forum. The state creates a limited public forum when it "open[s] for use by the public ... a place for expressive activity." Perry, 460 U.S. at 45, 103 S.Ct. at 955; see also Widmar v. Vincent, 454 U.S. 263, 267-68, 102 S.Ct. 269, 273-74, 70 L.Ed.2d 440 (1981) (state created a limited public forum by opening its facilities to accommodate student meetings). Limited public fora are governed by the same standards as public fora:
 
 
 13
 Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest.
 
 
 14
 Perry, 460 U.S. at 46, 103 S.Ct. at 955.
 
 
 15
 We must determine the type of forum created by the Rent Control Board in order to ascertain the propriety of its speech regulations. In City of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Employment Relations Comm'n, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976), the Supreme Court stated that a school board meeting was open to the public under state law, and that any citizen was permitted to address the board during the time the board had dedicated for public commentary. To a claim that state law nevertheless prohibited a teacher from addressing the school board on union matters, the Court answered:
 
 
 16
 To permit one side of a debatable public question to have a monopoly in expressing its views to the government is the antithesis of constitutional guarantees. Whatever its duties are as an employer, when the board sits in public meetings to conduct public business and hear the views of citizens, it may not be required to discriminate between speakers on the basis of their employment, or the content of their speech.
 
 
 17
 Id. at 175-76, 97 S.Ct. at 426. The Court did not declare that a limited public forum had been created, and Justice Stewart noted in a concurring opinion that public bodies must have a rather broad authority to structure meetings, even if that requires limiting subject matter and number and types of speakers. Id. at 176-78, 97 S.Ct. at 427-28 (Stewart, J., concurring). But, he said, the Court was not then called upon "to consider what constitutional limitations there may be upon a governmental body's authority to structure discussion at public meetings." Id.
 
 
 18
 In Perry the Court did cite City of Madison when it was describing limited public fora. 460 U.S. at 45, 103 S.Ct. at 955. Also, in White v. City of Norwalk, 900 F.2d 1421 (9th Cir.1990), we said that city council meetings, like those of the City of Norwalk, "have been regarded as public forums, albeit limited ones." Id. at 1425. However, we did not say that we agreed that those meetings were public fora. Instead, we quickly added:
 
 
 19
 Public forum or not, the usual first amendment antipathy to content-oriented control of speech cannot be imported into the Council chambers intact. In the first place, in dealing with agenda items, the Council does not violate the first amendment when it restricts public speakers to the subject at hand. While a speaker may not be stopped from speaking because the moderator disagrees with the viewpoint he is expressing, it certainly may stop him if his speech becomes irrelevant or repetitious.
 
 
 20
 Id. (citations omitted). We went on to say that disruptions could be prevented and that a speaker may disrupt a board meeting "by speaking too long, by being unduly repetitious, or by extended discussion of irrelevancies." Id. at 1426. With all of those restrictions, the type of forum described looks very much like a nonpublic one. As the Supreme Court said in Lamb's Chapel v. Center Moriches Sch. Dist., --- U.S. ----, ----, 113 S.Ct. 2141, 2147, 124 L.Ed.2d 352 (1993):
 
 
 21
 With respect to public property that is not a designated public forum open for indiscriminate public use for communicative purposes, we have said that "[c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."
 
 
 22
 (citation omitted); see also Planned Parenthood, 941 F.2d at 829.
 
 
 23
 It seems to us that the highly structured nature of city council and city board meetings makes them fit more neatly into the nonpublic forum niche. But, as we intimated in City of Norwalk, the important thing is not whether we call the meetings highly regulated limited public fora or nonpublic fora. The fact remains that limitations on speech at those meetings must be reasonable and viewpoint neutral, but that is all they need to be. With that in mind we turn to the facts of this case.
 
 
 24
 Kindt bridles at the fact that he cannot debate the Board's flag salutes (Item 1) and special agenda items (Item 4) at the very time that they occur. He argues that because Item 13 matters occur at the end of the meeting, he is "deprived of speech" because he has a smaller audience by the time he is allowed to speak and because he is not allowed more than three minutes to respond to longer presentations by speakers who addressed the Board under Item 4. Those facts do not establish that Kindt's First Amendment rights were violated. The Board regulations restricting public commentary to three minutes per item at the end of each meeting are the kind of reasonable time, place, and manner restrictions that preserve a board's legitimate interest in conducting efficient, orderly meetings. See City of Madison, 429 U.S. at 175 n. 8, 97 S.Ct. at 426 n. 8 ("Plainly, public bodies may confine their meetings to specified subject matter...."); Wright v. Anthony, 733 F.2d 575, 577 (8th Cir.1984) (five-minute limitation on presentation to congressman was a reasonable restriction and served significant governmental interest in conserving time and ensuring that all had an opportunity to speak). Kindt was not entitled to an "equal time" response period to rebut the views of the Item 4 speakers at the moment they concluded their remarks. He does make a valid point when he notes that the Board sometimes passed resolutions on tangential topics before he had a chance to address it under Item 13. At first blush, that does appear to violate the Board's own rules.[4] While we would not condone the Board's failure to follow its rules in that respect, that is far from a showing that Kindt's First Amendment rights were violated. No invidious regulation of Kindt's speech was implicated and content was not a factor--e.g., the fact that the Board's views on the Cambodian regime might or might not be different from Kindt's was not the point at all. Whether he wanted to speak in favor of those views or against them, his chit had to be heard under Item 13, which was the time set aside for public comment on all but such special matters as public hearings (Item 7). In other words, if the type of tangential resolution in issue here was meant to be covered by Rule 1024, the vice is not that the Board failed to hear public comment during the part of the agenda given over to "announcements, commendations, award of service pins, introduction of special guests," Item 4, or the "salute to the flag," Item 1. The vice is that the Board passed resolutions before it heard from the general public. That is not a violation of the First Amendment.
 
 
 25
 Again, Kindt was not kept from speaking because of the content of his speech, but because he submitted chits for items that were not held open for public commentary until Item 13 on the agenda. When the Board heard comments during Item 13, Kindt was never denied an opportunity to speak about any subject he wished. In fact, several times he addressed personally derogatory remarks to individual Board members and was not silenced. Nor was he silenced before his time expired. In general, when Kindt was actually ejected from the Board meetings he was disrupting the proceedings by yelling and trying to speak when it was not time for an Item 13 matter. The only exception was when the ejection did not come until sometime after he and his cohort had disrupted a meeting, and the Board had taken a break to let things settle down. It appears that as soon as the Board returned, Kindt's cohort was seen to make an obscene gesture toward a Board member, which threatened to start the disruption all over again. Those were permissible removals within the Board's regulation 1017 governing rules of decorum at Board meetings. See City of Norwalk, 900 F.2d at 1424-26 (upholding ejection of a disruptive citizen from a city council meeting under nearly identical decorum regulations and pointing out that a great deal of discretion must be left to the entity).
 
 
 26
 Kindt finally argues that because the Board "exceeded" its jurisdiction by discussing political matters and making announcements unrelated to rent control, it therefore created a situation in which "[t]he Constitution allows Kindt the right to oppose [the Board's] views just as freely as if all the parties were on a street corner." That is an incorrect reading of the law regarding the meetings of public bodies.[5] Even if the Board did have speakers[6] from the community talk to it about the death penalty, the Greyhound bus strike, or the political regime in Cambodia, that did not give Kindt an unregulated right to respond in kind. As Justice Stewart emphasized in his concurring opinion in City of Madison:
 
 
 27
 A public body that may make decisions in private has broad authority to structure the discussion of matters that it chooses to open to the public. Such a body surely is not prohibited from limiting discussion at public meetings to those subjects that it believes will be illuminated by the views of others and in trying to best serve its informational needs while rationing its time[.] I should suppose a public body has broad authority to permit only selected individuals--for example, those who are recognized experts on a matter under consideration--to express their opinions.
 
 
 28
 City of Madison, 429 U.S. at 177, 97 S.Ct. at 427-28 (Stewart, J., concurring) (emphasis added). When Justice Stewart used the language "in private" it appears that he meant "without public input" as opposed to "in some adytum." In context, that is the best reading and was a good prediction about the development of the law in this area. Kindt's alternate notion--public body meeting rooms metamorphose into street corners if the body adopts a nongermane resolution--defies common sense and logic, not to mention the need for civility and expedition in the carrying out of public business. Meetings of a public body do not become free-for-alls simply because the body goes beyond what a member of the public believes (even correctly) to be the body's proper purview.
 
 
 29
 In fine, the Santa Monica Rent Control Board's regulations governing when the public may address the Board are reasonable content-neutral time, place, and manner restrictions that are not intended to suppress a particular viewpoint. There is no genuine issue of material fact as to whether the Board denied Kindt his First Amendment rights.
 
 CONCLUSION
 
 30
 Kindt argues that the Santa Monica Rent Control Board and its members may neither place unreasonable restrictions upon speakers nor enforce restrictions in a manner that is not content neutral. We agree.
 
 
 31
 He also insists that he presented evidence that the Board violated those principles. With that we cannot agree because the record fails him. Nothing indicates that Kindt was prevented from speaking his mind on his chosen topics. Indeed, the Board's members regularly endured Kindt's philippics and, essentially, restrained him only when he abandoned all sense of decorum. That is not the stuff that First Amendment violations are made of.
 
 
 32
 AFFIRMED.
 
 
 
 [1]
 Rent Control Board meetings follow the following agenda:
 Item 1 Call to order and salute to the flag
 Item 2 Roll call
 Item 3 Approval of minutes of previous meeting
 Item 4 Special agenda items (announcements, commendations, award of service pins, introduction of special guests)
 Item 5 Agendized items of previous Board meeting not considered at that meeting
 Item 6 Consent calendar
 Item 7 Public hearings
 Item 8 Resolutions or rules
 Item 9 Reports of committees
 Item 10 Administrative items
 Item 11 Written communications
 Item 12 Board discussion items
 Item 13 Requests to speak to the Board.
 
 
 [2]
 Ralph M. Brown Act, Cal.Gov't Code Secs. 54950-54961 (governing the conduct of public commission, board, and council meetings)
 
 
 [3]
 We say cohort because from the record it is apparent that Kindt and the other person, Chester A. Hoover, often acted together in interrupting, yelling, and generally disrupting Board meetings. The record indicates that they nearly always sat next to each other and frequently applauded each other's speeches. Many times they appeared to be working in tandem or in unison. So it must surely, and reasonably, have seemed to the Board
 
 
 [4]
 The relevant regulation reads as follows:
 1024 Regulations and Resolutions
 (a) The Presiding Officer, before calling for a motion on the adoption of any regulation or resolution, shall first inquire if there is anyone who desires to be heard on said proposed regulation or resolution. All persons desiring to be heard must have registered with the Secretary, prior to the discussion of the regulation or resolution, their name and home address and the regulation or resolution item they wish to speak on and the Presiding Officer will call upon speakers from that list.
 
 
 [5]
 The cases Kindt cites for this proposition are inapposite. Neither one dealt with speech at a public board meeting. Grayned v. City of Rockford, 408 U.S. 104, 116-17, 92 S.Ct. 2294, 2303-04, 33 L.Ed.2d 222 (1972), dealt with the constitutionality of statutes which regulated demonstrations outside of a public school. Cohen v. California, 403 U.S. 15, 21-22, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971), dealt with speech in the corridor of a public building
 
 
 [6]
 The record indicates that some of the Item 4 special agenda speakers made requests to speak to the Board. At the meeting of March 29, 1990, for example, Chairperson Davis indicated that the ACLU representative had presented a request to address the Board about the death penalty. Kindt presented no evidence that he ever submitted an advance request to address the Board as part of the special agenda only to have had his requests denied. The record indicates that the only method by which Kindt sought to address the Board was by submitting chits on items. Had the evidence shown that those promoting certain viewpoints unrelated to the Board's scope could speak under Item 4 and those promoting opposing viewpoints could not, this would be a different, and more difficult, case