In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-4294

KATHRYN GROSSMAN,

*Plaintiff-Appellant*,

*v.*

SOUTH SHORE PUBLIC SCHOOL DISTRICT, *et al.*,

*Defendants-Appellees*.

———————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 06-C-288-S—**John C. Shabaz**, *Judge*.

———————

ARGUED SEPTEMBER 24, 2007—DECIDED NOVEMBER 15, 2007

———————

Before POSNER, FLAUM, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiff was hired by the defendant public school district in 2002 on a three-year probationary contract to be a guidance counselor at the public school of the tiny town of Port Wing (population less than 500) on the south shore of Lake Superior. The school has grades kindergarten through twelfth grade. When three years later it was time to decide whether to renew her contract, which would have given her lifetime tenure, so that she could not have been fired without just cause, the school district decided against renewal, precipi-

tating this suit. In it she charges that the district's decision was based on hostility to her religious beliefs, and so violated both Title VII of the Civil Rights Act of 1964 and the free-exercise clause of the First Amendment. The district court granted summary judgment for the school district, and also for the school administrators, additional defendants whom we need not discuss separately; nor need we discuss the plaintiff's constitutional claim.

Shortly after she began work, she discovered in her office some literature designed to instruct students in the use of condoms. She threw out the literature without consulting her supervisors and, also without consulting them, ordered literature advocating abstinence to replace the discarded condom literature. Then, on graduation day in the plaintiff's first year, the student who was to give the graduation speech came to her with a bad attack of nerves. The plaintiff asked whether she could pray with her about the speech and the student agreed and they prayed together. The same thing happened the following year when a 12-year-old student, upset about her mother's having miscarried, came to the plaintiff in tears.

In the plaintiff's memorandum of a meeting with the school superintendent after she learned that her contract would not be renewed, under the heading "philosophical [issues]," we read that the superintendent's concerns about her were "too much religion," "6 pregnant teen parents," and "2 Reports of prayer." The plaintiff's notes of a subsequent, similar meeting list her supervisors' concerns under the heading of "religion" as separation of church and state and the first incident of praying with a student, and under the heading of "philosophical differences" birth control and abstinence. Notes of another participant at that meeting record concern that "faith

controlled her philosophy," that she did not make a "good fit" with the school, and that she "believed in" abstinence. Apart from matters relating to religion, her performance as a guidance counselor was exemplary.

The school district states the issue to be whether the plaintiff was discriminated against on account of her being a Christian. That is not correct. The supervisors are Christians; and it is a fair guess that atheists and other non-Christians do not pull the strings at Port Wing's sole public school. With 838 churches (116 of them Lutheran—the plaintiff's denomination, though there are different sects within Lutheranism) within about 40 miles of tiny Port Wing, it can hardly be a region hostile to Christianity. The issue is whether the plaintiff's specific religious beliefs were a ground for her not being retained. It would not be out of the question for a public employee to be fired because her supervisors, though also Christian, did not like her brand of Christianity, though there is no evidence (besides the treatment of the plaintiff) of religious strife in Port Wing's public school.

The school district's better argument is that, as far as the record shows, the plaintiff was let go not because of her beliefs but because of her conduct. We are not told the size of the student body at Port Wing's public school, but it cannot be very large; the entire population of Bayfield County, the sprawling rural county in which Port Wing is located, is only 15,000. Six teenage pregnancies among the students at the school seem like a lot, and it is easy to understand how the people running the school would think it imprudent to retain a guidance counselor who throws out pamphlets instructing in the use of condoms and replaces them with pamphlets advocating abstinence. According to a federally sponsored study that "compare[d]

outcomes for two statistically equivalent groups—a program group and a control group—created by random assignment, . . . [in which] youth in the program group were eligible to receive the abstinence education program services, while those in the control group were not, and received only the usual health, family life, and sex education services available in their schools and communities"), programs advocating teenagers to abstain from sex are not effective. Christopher Trenholm *et al.*, "Impacts of Four Title V, Section 510 Abstinence Education Programs" (Mathematica, Inc., Apr. 2007), www.mathematica-mpr.com/tabstinencereport.asp (visited Oct. 4, 2007); Laura Sessions Stepp, "Study Casts Doubt on Abstinence-Only Programs," *Wash. Post*, Apr. 14, 2007, p. A2; cf. Gerald S. Oettinger, "The Effects of Sex Education on Teen Sexual Activity and Teen Pregnancy," 107 *J. Pol. Econ.* 606 (1999). In addition, while it seems unlikely that this rural school district is in serious danger of being sued for violating the establishment clause of the First Amendment just because the school guidance counselor discarded condom literature and volunteered to pray with a total of (as far as the record discloses) only two students in three years, religion is such a sensitive subject that it is understandable why the school authorities would be worried by such incidents.

Even some (perhaps many) religious parents would not like a teacher or other employee of the school praying with their children, or advocating abstinence as the sole method of birth control. "Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or

her family." *Edwards v. Aguillard,* 482 U.S. 578, 584 (1987). Guidelines issued by the federal Department of Education provide that "when acting in their official capacities as representatives of the state, teachers, school administrators, and other school employees are prohibited by the Establishment Clause from encouraging or discouraging prayer, and from actively participating in such activity with students." "Guidance on Constitutionally Protected Prayer in Public Elementary and Secondary Schools," U.S. Department of Education," Feb. 7, 2003, www.ed.gov/policy/gen/guid/religionandschools_guidance.html (visited Oct. 9, 2007).

Teachers and other public school employees have no right to make the promotion of religion a part of their job description and by doing so precipitate a possible violation of the First Amendment's establishment clause, e.g., *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384, 394 (1993); *Lee v. Weisman*, 505 U.S. 577, 593-98 (1992); *Helland v. South Bend Community School Corp.*, 93 F.3d 327, 331 n. 1 (7th Cir. 1996); *Marchi v. Board of Cooperative Educational Services of Albany*, 173 F.3d 469, 475-76 (2d Cir. 1999); *Peloza v. Capistrano Unified School District*, 37 F.3d 517, 522 (9th Cir. 1994) (per curiam), even if the religious composition of the local community makes a legal challenge unlikely. The First Amendment is "not a teacher license for uncontrolled expression at variance with established curricular content." *Palmer v. Board of Education,* 603 F.2d 1271, 1273 (7th Cir. 1979); see also *Mayer v. Monroe County Community School Corp.*, 474 F.3d 477 (7th Cir. 2007).

Even if it is certain that there is no danger of a suit, the school authorities have a right to control the school curriculum, *Webster v. New Lenox School District No. 122*, 917

F.2d 1004, 1007-08 (7th Cir. 1990), and, equally, to control the policies of its guidance counselors and other staff. (Staff that interact with students play a role similar to teachers.) So the plaintiff is right to concede that the Port Wing school administrators could forbid her to pray with students or to urge abstinence on them in lieu of contraception as a method of avoiding pregnancy. It is not as if they would be discriminating against religion by doing these things, as they would be if they forbade students to form or join religious societies while allowing them to form or join secular ones. E.g., *Good News Club v. Milford Central School*, 533 U.S. 98, 111-12 (2001); *Lamb's Chapel v. Center Moriches Union Free School District*, *supra*, 508 U.S. at 394.

It would be different if the plaintiff's religious conduct had merely tipped off her supervisors to the fact that she held religious beliefs that they find repulsive and it was her beliefs, not her conduct, that precipitated their refusal to renew her contract. That is the plaintiff's theory of the case, but there is too little evidence to create an issue for trial. The only religious beliefs that the plaintiff's conduct signaled were that teenage sex is bad and that prayer is efficacious, and these views are almost certainly shared by the Christian school administrators who decided not to renew her contract. She makes the strange argument that her advocacy of abstinence and disapproval of contraception marked her as an evangelical Christian, forgetting that the Catholic Church considers the use of contraceptives a mortal sin and that most other Christian sects as well disapprove of nonmarital sex. Were a jury to find that the school administrators wouldn't have refused to renew the plaintiff's contract had it not been for her religious beliefs, the judge would have to

set aside the verdict as based on speculation rather than on a defensible view of the evidence.

For at bottom the plaintiff has nothing to go on besides the words "philosophy" and "philosophical" in the notes of her conferences with her supervisors, as if the school administrators had engaged her in a theological debate. They had not. The reference to her preferring abstinence as a strategy for preventing teenage pregnancy to contraception (and likewise the references to her "belief" in abstinence and her not making a "good fit" with the school) related to her *approach* to the problem of teenage pregnancy rather than to her theological views. Those views were the *cause* of her approach, but so far as the record shows it was the approach that concerned the school administrators. So summary judgment was rightly granted for the defendants. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-52 (1986).

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*