**SARATOGA BIBLE TRAINING INSTITUTE, INC. d/b/a New Covenant Community Church, Plaintiff,**

v.

**SCHUYLERVILLE CENTRAL SCHOOL DISTRICT, Defendant.**

**No. 98–CV–0552 LEK/DRH.**

United States District Court, N.D. New York.

May 5, 1998.

**180**

Helm, Shapiro, Anito & McCale, P.C., Albany, NY, for Plaintiff.

Ruberti, Girvin & Ferlazzo, P.C., Albany, NY, for Defendant.

### *MEMORANDUM–DECISION & ORDER*

KAHN, District Judge.

#### *Introduction*

On April 3, 1998, plaintiff, Saratoga Bible Training Institute, Inc. d/b/a New Covenant Community Church ("NCC"), commenced the instant action pursuant to 42 U.S.C. § 1983 seeking permanent injunctive relief that would require the defendant Schuylerville Central School District ("District") to grant plaintiff access to its high school auditorium on May 10 and 11, 1998, or any day thereafter, for the purpose of holding an "Answers In Genesis" ("AIG") seminar. Presently plaintiff seeks a preliminary injunction granting the same relief. The Court entertained the oral arguments of the parties on April 17, 1998 and reserved decision.[1]

#### *Background*

NCC is a religious organization whose church is located in Easton, New York. AIG is a not-for-profit Christian ministry headquartered in the Cincinnati area. As its name suggests, AIG sponsors seminars addressing the origin of man from a biblical viewpoint.

During September 1997, Robert Carr, a member of NCC, learned that Dr. Carl Weiland, a Christian speaker from Australia associated with AIG, would soon be on a lecture tour in the United States. Dr. Weiland would be available to speak in the Schuylerville area during May 10–11, 1998. Robert Carr then contacted AIG and it was agreed that NCC would sponsor Dr. Weiland's visit to the area. NCC expects that some 400 persons would attend Dr. Weiland's presentation. According to NCC, if Dr. Weiland cannot lecture on May 10 and 11, 1998 he will be unable to again visit the region for some 18 months.

Seeking a forum for Dr. Weiland's lecture, Mr. Carr filed an application dated October 27, 1997 with the District to request the use

---

1. Following argument the parties submitted various additional papers without leave of Court. None of these submissions were considered in reaching the instant decision.

of the Schuylerville High School auditorium on May 10–11, 1998. Attached to the application was an addendum which described Dr. Weiland's presentation. This addendum stated that Dr. Weiland's "lectures focus on the controversial subject of our origins ... he is taking a biblical viewpoint .... [w]hat makes this man especially worth listening to is that he embraces a thorough scientific approach to the whole subject, which makes for quite an eye opening and thought provoking presentation." Reed Aff. Ex. C.

In early December 1997, Dr. Leon Reed, Superintendent of the Schuylerville Central School District, telephoned Mr. Carr and advised him that NCC's request to use the high school auditorium was denied. Mr. Carr and Dr. Reed later met on December 2, 1997 and discussed the reasons behind the denial. Although some of what was said at the meeting remains in dispute, certain relevant points of that conversation are undisputed. Dr. Reed stated that the School District's facilities were only allowed to be used for education, athletic activities, or live plays. Dr. Reed also stated that the District's policy did not permit outside groups to use the high school auditorium for lectures, speeches, rallies, debates or similar activities.

Subsequently, the Schuylerville Central School Board of Education (the "School Board") reviewed Dr. Reed's decision to deny NCC's application to use the high school auditorium. By letter dated January 9, 1998 the School Board confirmed Dr. Reed's decision. That letter stated in part:

The Board of Education has decided to confirm Dr. Reed's decision. The Board of Education's decision to deny your application is based upon the same reasons as the initial denial. These reasons include the fact that the District has not opened the High School Auditorium to indiscriminate use by outsiders, thereby creating an "open forum". The District has consistently limited access to the High School Auditorium to use for dramatic presentations by local community groups. The District has consistently refused to permit the school's auditorium to be used for lectures and presentations. For example, the League of Women Voters, political candi-

dates and a telecommunications company have been denied the use of the auditorium. The Board of Education has no knowledge of the District ever permitting an outside group to use the auditorium to present any lectures, presentations or any other forums, regardless of the viewpoint of the presentation since the implementation of the building use policy in 1991. Carr Decl. Ex. C.

The "policy" referred to in the School Board's January 9, 1998 letter had been in place since 1991. It set forth rules and procedures to be followed by any group seeking to use District facilities. This policy also enunciated the District's position on the subject of community use of District facilities. On this point the policy stated:

It is the intent and the policy of the Board to encourage the beneficial use of school buildings for community wide activities. This is meant to include those uses enumerated under Section 414 of the NYS Education Law. Individuals or organizations wishing to use the school facilities in accordance with Section 414 of this policy must secure written permission from the Superintendent and abide by the rules and regulations established for such use.

Carr Decl. Ex. D. The policy further defined the permitted use of the high school auditorium as follows:

The principal is authorized to grant groups one evening's permission to use the auditorium for community projects, provided that no admission is charged, that the meeting is open to the public, and that the use is one authorized by Section 414 of the Education Law.

Carr. Decl. Ex. D. During January 1998 the District amended its policy regarding the use of District facilities. According to the members of the School Board, the policy was amended in order to "confirm the District's long-standing practice of limiting access to outside groups and to clarify the Board's 1991 policy in light of the developments within the legal area involving constitutional disputes over access to public schools." Barber Aff. ¶ 19; Ainsworth Aff. ¶ 19; Kish Aff. ¶ 19; Macica Aff. ¶ 19. In similar fashion to the 1991 policy, the District's amended 1998 poli-

cy sets forth the procedures and rules to be followed by any individuals or organizations seeking to use school facilities. Once again, the District's position on the use of District facilities is set forth:

> It is the intent and policy of the Board of Education to balance the interests of preserving school buildings and school property for the principle purpose of educating students within the District, and the desire to permit specific uses of school facilities by community organizations when such use will not interfere with educational activities. This policy is intended to permit specific types of beneficial uses of specific District facilities in accordance with the District's recent history of granting limited access by community-based organizations. This policy is intended to comply with Section 414 of the New York State Education Law which authorizes, but does not require, school districts to open school facilities for certain types of activities. This policy is intended to create and preserve a limited public forum within specific District facilities described below while creating and maintaining the closed nature of all other District facilities which are not described below.

Reed Aff. Ex. B. With respect to the high school auditorium, the amended 1998 policy provides that it "shall be available for live plays." Reed Aff. Ex. B. The amended 1998 policy also includes several new "Conditions of Use for Auditoriums and Gymnasiums." *Id.* Among these is the condition that "[t]he Board of Education reserves the discretion to deny access to District facilities described above, or terminate access to these District facilities ... for any use which could have the effect of violating the establishment Clause of the United State [sic] Constitution

or other provisions of the United States Constitution or New York Constitution." *Id.* ¶ (H)(2).

On January 26, 1998 NCC's attorney filed a request for information with the District under New York's Freedom of Information Law ("FOIL"). *See* N.Y.Pub. Officers L. § 89(3) (McKinney 1988). That request sought a wide range of District documents pertaining to the issue of what entities applied for, actually used, and were denied the use of District facilities.[2] On February 13, 1998 the District responded by granting NCC's attorney access to the "building use files" that it maintains. *See* Reynolds Aff. Ex. D. These files contained completed "Building Use Request Forms" submitted to the District together with any related correspondence. *See id.* Following his review of the District's files, NCC's attorney compiled a list of organizations that the District had approved to use its buildings and/or grounds between 1992 and 1997. Reynolds Aff. ¶ 8.

NCC's complaint sets forth a single cause of action alleging that the denial of its request to use the high school auditorium was due to religious discrimination and violates its rights under the First and Fourteenth Amendments to the United States Constitution. The District asserts that the denial of NCC's request was made without respect to the viewpoint presented in Dr. Weiland's lecture and comported with the its policy that the high school auditorium not be used by non-school groups for lectures, rallies, demonstrations, political events, or seminars.

## *Discussion*

### A. *Preliminary Injunction Standard*

Initially, the Court observes that the parties disagree on the standard to be

---

**2.** In particular, plaintiff's FOIL request sought the following:

1. All Building Use Request forms submitted to SCS from January 1991 to date.

2. All correspondence or other written material received by SCS in connection with Building Use Requests from January 1991 to date.

3. A complete list of all entities (individuals or organizations) who have used SCS facilities, buildings or grounds from January 1991 to date.

4. A complete list of all entities (individuals or organizations) who were denied use of

school facilities, buildings or grounds from January 1991 or date.

5. Correspondence or other written memoranda or material produced by SCS, its agents or employees, which relate to requests by non-school entities for use of SCS facilities, buildings or grounds from January 1991 to date.

6. All written policies of the SCS Board of Education to facility use from January 1991 to date.

Reed Aff.Ex. B.

employed in determining whether the plaintiff is entitled to a preliminary injunction. Generally, a preliminary injunction is properly granted where the moving party can demonstrate "(a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33 (2d Cir.1995). There are, however, some circumstances where a higher standard applies. One such circumstance is when the preliminary injunction grants essentially all of the relief sought in the complaint, and that the relief granted could not be undone in the event the defendant ultimately prevailed at trial. *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir.1996). In that type of case, a plaintiff seeking a preliminary injunction must show irreparable harm and a "clear" or "substantial" likelihood of success on the merits. *Id.* The instant case is an obvious candidate for this more rigorous standard. For the plaintiff, it is the right to host Dr. Weiland at the Schuylerville High School auditorium on May 10 and 11, 1998 that is, in the vernacular, "the whole ball of wax" in this litigation. Should an order issue from this Court directing the District to open the high school auditorium for Dr. Weiland's lecture, there will not be anything left to litigate (in a real sense) after May 11, 1998. Accordingly, before NCC will be entitled to relief it must demonstrate a clear or substantial likelihood of success on the merits.

### 1. *Irreparable Harm*

The District argues that NCC cannot show irreparable harm because it has not demonstrated that the high school auditorium is the only venue suitable for Dr. Weiland's lecture. This contention is without merit as it places a burden on the First Amendment plaintiff that the law does not recognize. "The 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *New York Magazine v. Metropolitan Transp. Auth.*, 136 F.3d 123, 127 (2d Cir.

1998) (quoting *Deeper Life Christian Fellowship, Inc. v. Board of Educ.*, 852 F.2d 676, 679 (2d Cir.1988)); *Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir.1996) ("[v]iolations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction"). Thus, if NCC is correct in its contention that the District's denial of its request violates its First Amendment rights, irreparable harm will be established a *fortiori*.

### 2. *Substantial Likelihood of Success on the Merits*

As noted above, the complaint pleads a single claim under the First and Fourteenth Amendments to the United States Constitution. The complaint's allegations are also couched in terms of the plaintiff's "right[ ] to exercise its religious beliefs." Cmplt. ¶ 21. However, from the balance of the submissions and the arguments. of counsel, it is apparent that the federal right which the plaintiff seeks to vindicate is its right to free speech under the First Amendment. After all, the plaintiff seeks the right to use the District's property not to practice its religion but to have Dr. Weiland deliver a public lecture in the high school auditorium and entertain questions from the public following the lecture. The lecture will have a religious viewpoint but it will be a mere lecture nonetheless. With this observation, the Court turns to NCC's substantive claim.

In evaluating NCC's First Amendment claim, we must begin from the premise that the District's property is private property. "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Defense and Educational Fund*, 473 U.S. 788, 799–800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Cognizant of this principle, the Supreme Court's jurisprudence on the subject has developed so that one's "[f]reedom to speak on government property is largely dependent on the nature of the forum in which the speech is delivered." *Bronx Household*

of Faith v. Community School Dist. No. 10, 127 F.3d 207, 211 (2d Cir.1997), cert. denied, — U.S. —, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998). Three distinct types of First Amendment fora have been identified by the Supreme Court. See Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

The first type of forum is the traditional public forum. These are "places which by long tradition or by government fiat have been devoted to assembly and debate." Id. at 45, 103 S.Ct. 948. Examples are "streets and parks which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" Id. (quoting Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)). Government attempts to regulate the content of speech in a traditional public forum will be the subject of strict judicial scrutiny. Id. Any restrictions must be "necessary to serve a compelling state interest [and must be] narrowly drawn to achieve that end." Id. Regulations of time, place and manner in a public forum will survive if they are "content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Id.

At the other end of the spectrum is the nonpublic forum. "A nonpublic forum is government property that has not been opened for public speech either by tradition or by designation." Bronx Household, 127 F.3d at 212. "In addition to time, place and manner restrictions, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Perry, 460 U.S. at 46, 103 S.Ct. 948.

The third category is the designated public forum. It "consists of property that would be a nonpublic forum except for the fact that government has intentionally opened it for use by the public for expressive activity." Travis v. Owego–Apalachin School Dist., 927 F.2d 688, 692 (2d Cir.1991). In a designated public forum, the government may impose "[r]easonable time, place, and manner regulations." Perry, 460 U.S. at 46, 103 S.Ct. 948. Content-based restrictions must, however, be narrowly drawn and must serve a compelling state interest. Id.

The Second Circuit has identified a sub-category of the designated forum that it has described as the limited public forum. See Travis, 927 F.2d at 692. This type of forum is created when the state opens its private property but imposes a limit on the kinds of speakers or the kinds of subjects that may be discussed. Id. In a limited public forum, "constitutional protection is afforded only to expressive activity of a genre similar to those that government has admitted to the limited forum. Thus, in a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre." Id. However, with respect to all unspecified uses, the government property in question remains a nonpublic forum. Deeper Life Christian Fellowship v. Board of Educ., 852 F.2d 676, 679 (2d Cir.1988).

"A determination of the State's intent in creating a forum is a fact-oriented inquiry, and the past practice of the School Board in regard to its use of the property at issue is a proper consideration in that inquiry." Id. at 680 (citation omitted). The District acknowledges that it has in the past and presently does open the high school auditorium to outside or non-school community groups for certain uses. In light of this practice, the high school auditorium cannot be described as a nonpublic forum. The notion that the Schuylerville high school auditorium is a traditional public forum can also be easily dismissed. "[P]ublic schools do not possess all of the attributes of streets, parks and other traditional public forums." Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 267, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). Although the District has opened the high school auditorium to the public, it has not opened that facility "for indiscriminate

use by the general public." *Perry,* 460 U.S. at 47, 103 S.Ct. 948. Instead, the District has always exercised control over the use of its facilities, limiting public use in accordance with its policy. State law also expressly limits the public use of school facilities. *See* N.Y.Educ.Law § 414 (McKinney 1988 and Supp.1997). Absent evidence that the District purposefully opened the auditorium to indiscriminate public use it cannot be described as a traditional public forum. The high school auditorium is therefore properly described as a designated or limited public forum. Thus, in order to prevail, NCC must show that the District's policy discriminates on the basis of viewpoint or that the District has previously opened the high school auditorium to uses similar to NCC's proposed use. *Travis,* 927 F.2d at 692.

■ NCC argues that the District has opened its doors to a wide and diverse group of private organizations in the past five years. Therefore, NCC argues, since it was singled out when its request was denied, the denial was based on NCC's religious viewpoint. The District denies that NCC's religious viewpoint had a role in its determination to deny NCC's request to use the auditorium. The District contends that its denial was merely a product of the implementation of its standing policy which did not permit the high school auditorium to be used for lectures, rallies, demonstrations, political events, or seminars. According to the School Board, the only outside-group events which it permits in the high school auditorium are theatrical or musical presentations and rehearsals. The stated reason for this policy is the desire to prevent "transforming the District into a stage for public debate and controversy." Barber Aff. ¶ 15. The School Board is of the opinion that an atmosphere of debate and controversy would not be conducive to learning.

There is no proof in the record which demonstrates that the School Board denied NCC's application to use the high school auditorium "solely because of the religious viewpoint of the program it wished to present." *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 760–64, 115 S.Ct. 2440, 2446–47, 132 L.Ed.2d 650 (1995). NCC relies primarily upon Mr. Carr's conversations with Dr. Reed in its effort to extrapolate an anti-religious animus from the School Board's decision. Mr. Carr's retelling of his conversations with Dr. Reed, closely read, do not establish that Dr. Reed made the initial decision to deny NCC's application due to the viewpoint of Dr. Weiland's lecture. *See* Carr Decl. ¶¶ 15–32. At most, Mr. Carr's account suggests that Dr. Reed is a strong believer in the separation of church and state and further, that Dr. Reed was concerned about opening the auditorium to a broad range of organizations that might wish to hold lectures there. Even assuming that Dr. Reed's remarks reveal his personal anti-religious bias, it nevertheless remains the bias, if any, of the School Board that concerns this Court. Dr. Reed is not a member of the School Board. Nor is there any basis in fact or law to find that he speaks for the School Board or that his position should otherwise be imputed to the Board.

■ NCC also relies upon the District's 1991 written policy, the history of access to District facilities, and the District's 1998 amendment of its written policy as evidence that its application was rejected by the School Board because of Dr. Weiland's religious viewpoint. NCC relies on this same evidence to demonstrate that Dr. Weiland's speech is of the same genre as prior uses that the District has permitted.

■ NCC contends that the 1991 written policy opens District facilities, including the high school auditorium, for community uses that are "beneficial" and that are otherwise permissible under § 414 of the New York Education Law. This a reasonable, if broad, reading of the District's 1991 policy. NCC also contends that Dr. Weiland's lecture would be beneficial to the community and is permissible under § 414 as constituting "instruction in any branch of education, learning or the arts." N.Y.Educ.Law § 414(1)(a) (McKinney's 1988 and Supp.1997). This is also a reasonable supposition. The fact that NCC's application was denied in light of the foregoing does not, however, equate with viewpoint discrimination. Section 414 clearly places the custody and control of the District's property in the Board of Education.

*See* N.Y.Educ.Law § 414(1) (McKinney Supp.1997). All uses set forth under that statute are permissive and permission may only be granted if the School Board believes that the particular use will not "be disruptive of normal school operations." N.Y.Educ.Law § 414(1) (McKinney's Supp.1997). In the present case the School Board has found that holding lectures, rallies, demonstrations, political events, or seminars in the high school auditorium would not be conducive to the District's mission to educate its students. Although this policy had not found written expression until the 1998 amendments to the District's policy, the undisputed evidence in the record substantiates that this is now and has been the District's consistent policy. NCC offers no proof to the contrary. NCC has provided nothing more than a list of past users of District facilities without any particular description of the nature of these uses. Absent is any evidence that these past users ever utilized the high school auditorium for lectures, rallies, demonstrations, political events, or seminars. The District, on the other hand, has come forward with specific instances where non-school related groups sought to use the high school auditorium for purposes similar to that of NCC's proposed use and were denied permission. *See* Reed Aff. ¶ 17. These included an application by the League of Women Voters to hold a political meeting; an application by a telecommunications company to make a presentation relating to local service; an application by an organization called *Farms First* to hold a lecture on why a local landfill should not be constructed in a nearby town; an application by another member of NCC to hold Sunday church services; an application by the Boy Scouts to hold an Eagle Scout Induction ceremony; an application by another local church group to hold a Baccalaureate Service; and an application by a local group seeking to hold a reception for a United States Congressman. *Id.*

The District's policy, which prohibits all lectures, is not a content-based restriction and can be said to impair the presentation of all viewpoints equally and is thus viewpoint-neutral. This fact distinguishes this case from *Lamb's Chapel v. Center Moriches Sch. Dist.,* 508 U.S. 384, 393–4, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), upon which NCC relies. In *Lambs Chapel,* a school district allowed private groups to use school facilities after school hours for several different social, civic and recreational uses. A group seeking to show a film about child rearing and family issues with a religious viewpoint was excluded solely because of the religious viewpoint of the film. The Supreme Court held that even though the school was not a public forum, the exclusion of the group was unconstitutional because the government was denying access to a speaker in order to suppress a particular (in that case religious) point of view on a subject that was otherwise presented on school property. *Id.* at 393–4, 113 S.Ct. 2141. The District's policy in the instant case, in contrast, cannot be said to favor one viewpoint at the expense of another. *Id.* at 394, 113 S.Ct. 2141.

■ NCC argues that the District's 1998 amendments to its policy, which include a specific reference to the Establishment Clause as a basis for denying a facility use request, is further evidence of the School Board's discriminatory intent. As noted above, the School Board explains these amendments as a method of conforming the written policy with past practice. There is no evidence which challenges this explanation. The inclusion of a provision permitting the School Board to deny an application if faced with an Establishment Clause violation accomplishes little more than stating a legally valid concern. The Supreme Court has repeatedly acknowledged that "[t]here is no doubt that compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech." *Capitol Square,* 115 S.Ct. at 2446. Put plainly, the School Board is within its rights to consider its compliance with the Establishment Clause when it permits others to use District facilities.[3] *Bronx Household,* 127 F.3d at 214.

---

**3.** Of course, fears about Establishment Clause violations are not a teflon shield against First Amendment claims and have often been held to be unfounded. *See Lamb's Chapel,* 508 U.S. at 395, 113 S.Ct. 2141 (1983).

Assuming that the high school auditorium is a limited public forum, NCC's proof is also insufficient to demonstrate that the District has opened the high school auditorium to non-school group lectures or seminars in the past. It cannot therefore demonstrate that Dr. Weiland's proposed lecture is of the same genre as other activities that have been permitted to be held within the high school auditorium. *Travis*, 927 F.2d at 692. Thus, the only constitutional question left for the Court is whether the District's prohibition against non-school group lectures, rallies, demonstrations, political events, or seminars in the high school auditorium is a reasonable "time, place and manner" restriction. *Perry*, 460 U.S. at 46, 103 S.Ct. 948. NCC has not offered any argument demonstrating that the policy is unreasonable and the Court finds that although there might be a difference of opinion on the issue, the District's policy is within the realm of reason.

Accordingly, since NCC cannot demonstrate that the District's denial was solely motivated by the viewpoint of Dr. Weiland's lecture or that the District has permitted uses of this genre in the past, the denial was lawful and NCC has not demonstrated a clear or substantial likelihood of success on the merits.

*Conclusion*

For the foregoing reasons, it is hereby

ORDERED that plaintiff's motion for a preliminary injunction is DENIED; and it is further

ORDERED that the Clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.